Mary Sue SEXTON, et al., Appellants,

v.

UNITED STATES of America.

No. 86–5677.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 28, 1987.

Decided Nov. 6, 1987.

Arthur H. Bryant, with whom Robert M. Hausman, Washington, D.C., was on the brief, for appellants.

Evelyn D. Sahr, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty. and Ralph H. Johnson, Atty.,

Dept. of Justice, Washington, D.C., were on the brief, for appellee.

Before RUTH BADER GINSBURG and WILLIAMS, Circuit Judges, and AUBREY E. ROBINSON,* Chief Judge.

Opinion for the Court filed by Circuit Judge WILLIAMS.

WILLIAMS, Circuit Judge:

Plaintiffs Mary Sue and Talmon Sexton have suffered as severe a loss as a parent can. Their son Dwayne died of leukemia at the age of six, after a three-year struggle against the disease. They and their son's estate have brought suit against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* (1982), claiming medical malpractice by federal government doctors at a clinic run by the Oak Ridge Institute for Nuclear Studies (later Oak Ridge Associated Universities) ("Oak Ridge"), a corporation conducting research under contract with the federal government. The negligence alleged consists essentially of the doctors' failure to provide chemotherapy as promptly and as continuously as they should have, and their use of radiation therapy techniques improperly exposing Dwayne to risks of infection.[1] Dwayne died on December 29, 1968, and the plaintiffs gave the government notice of their claim on June 14, 1983. The controlling statute of limitations, 28 U.S.C. § 2401(b) (1982), bars a claim of this sort unless it is presented "within two years after such claim accrues." The district court found that the claim accrued on Dwayne's death and that accordingly the suit was barred. It granted summary

judgment. *Sexton v. United States,* 644 F.Supp. 755 (D.D.C.1986). We affirm.

I

The relevant facts are neither complex nor seriously in dispute. In July 1965 the Sextons' family doctor diagnosed Dwayne as having aplastic anemia and referred the family to the Oak Ridge clinic. Joint Appendix ("J.A.") Exhibit ("Exh.") 1 at 35. (Citations to exhibits are numbered as in the Joint Appendix.) When the Sextons admitted Dwayne to the clinic they were aware that it was funded by the Atomic Energy Commission and that it was an experimental research hospital. *Id.* at 45; Exh. 3 at 36–37. Both parents signed an admittance agreement which stated, in part, that "any treatments administered ... may be experimental." Exh. 4 at 19.

After conducting several tests on Dwayne, the doctors at Oak Ridge rejected the earlier diagnosis and told the Sextons that Dwayne in fact had leukemia. Exh. 1 at 50–51. Independently of any discussion with the doctors, the Sextons believed at the time that the disease was fatal. As Mrs. Sexton later testified, "I knew leukemia was fatal. I knew that myself." Exh. 4 at 15; *see also* Exh. 1 at 61. That understanding appears to have been essentially correct. The only data in the record indicate that according to figures of the American Cancer Society, in the period 1965–69 the one-year survival rate for children under 15 with acute leukemia was 40 percent and the five-year survival rate was three percent. Exh. 4 at 207. None of Mrs. Sexton's testimony would support a claim that the doctors ever gave her a picture of the prospects under conventional

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The complaint also refers to exposure of Dwayne to excessive doses of radiation. As the immediate cause of Dwayne's death was infection, we take this to be an aspect of the second basic theory.

In addition to the allegations of medical malpractice concerning Dwayne and Mrs. Sexton, the Sextons alleged several other types of government negligence, including "negligent authorization and approval" of the contract with Oak Ridge, Joint Appendix ("J.A.") at 17, "negligent funding and approval" of the research at Oak Ridge, and "negligent funding, supervision, and control" of the radiation studies. J.A. at 28. For the purposes of this appeal, however, the complaint may be read as contending simply that the physicians at Oak Ridge were negligent in their treatment of Dwayne and Mary Sue Sexton.

treatment more gloomy than the reality. *See, e.g.,* Exh. 1 at 68–69.

Over the several days following this news, the doctors discussed several alternative methods of treating the disease. They explained to the Sextons that chemotherapy, the "standard treatment," would most probably offer Dwayne a lifespan of only three to five more years. They also described an experimental treatment called immunotherapy, which involved removing bone marrow from Dwayne, injecting the cells into a compatible donor, and re-injecting the cells into Dwayne. According to Mrs. Sexton, the doctors presented the experimental immunotherapy treatment as highly promising and a possible cure for leukemia. *Id.* at 58–61; Exh. 3 at 45–49. The doctors expressly told the Sextons that if they elected to try the immunotherapy, maintenance chemotherapy would be withheld in order to analyze the effects of the experimental treatment. *Id.* at 52; Exh. 1 at 78–79. They then took blood tests of both parents, and decided that Mrs. Sexton was the more compatible donor. The Sextons elected to try the experimental immunotherapy. They signed a form consenting to the treatment, acknowledging awareness that it was experimental and carried risks for both mother and child. Exh. 4 at 20.

Before the doctors started the experimental immunotherapy treatment, they gave Dwayne 17 days of chemotherapy. *Id.* at 208. In late August 1965 they performed the immunotherapy procedure on Dwayne and Mrs. Sexton, apparently successfully: Dwayne was in remission by mid-September. *Id.* at 208. In November 1965, however, he suffered a relapse and was readmitted to Oak Ridge. *Id.* at 208. Although the doctors suggested that immunotherapy be tried once again, with his father as the donor, the Sextons refused, fearing that Mr. Sexton might himself contract leukemia. *Id.* at 12; Exh. 1 at 119–20; Exh. 3 at 65–67. Dwayne was put on chemotherapy for the next three years. Exh. 4 at 205.

From late 1965 until late 1968, Dwayne underwent chemotherapy as an outpatient at Oak Ridge, alternating between remission and relapse at least four times. During this period, the Oak Ridge doctors forwarded Dwayne's medical records to the Sextons' family physician, Dr. Northrop, Exh. 1 at 107, 129, and discussed Dwayne's treatment and prognosis with him on several occasions. *Id.* at 129–30. In addition, Dr. Northrop sometimes administered chemotherapeutic drugs to Dwayne between outpatient visits to Oak Ridge. *Id.* at 129. During these visits Dwayne's parents discussed the treatment with Dr. Northrop. *Id.* at 140–41. Mrs. Sexton also set out to educate herself about leukemia. During the 1965–68 period she read many magazine and newspaper articles about the disease and possible treatments, *id.* at 133; by mid–1966 she was aware that even a short delay in treatment could harm the chances of a leukemia patient. *Id.* at 184.[2]

In November 1968 Dwayne suffered his final relapse and, now gravely ill, was admitted again to Oak Ridge. The physicians told his mother that Dwayne's leukemia was no longer responding to the treatment. *Id.* at 157. They suggested three alternatives: blood transfusions, which might only prolong his life by a matter of days or weeks; experimental chemotherapy; or experimental total-body radiotherapy. *Id.* at 157. They recommended the latter, suggesting that it might bring about a total remission. *Id.* at 158. They told the Sextons, however, that infection was a serious risk and must be avoided. *Id.* at 171; Exh. 3 at 76. After their review of the hazards and potential benefits of each, Exh. 4 at 208, Mrs. Sexton agreed to try total-body radiation. Again she signed a form which described the risks and experimental nature of the treatment and noted that it was not usual, that it was unproven, and that "the consequences may be unpredictable." *Id.* at 21.

Dwayne underwent total-body radiation therapy in the Medium Exposure Total

**2.** Mrs. Sexton continued her informal inquiries after Dwayne's death. She testified at her deposition that she learned about leukemia and the dangers of radiation in the years following her son's death from newspaper articles and television. Exh. 1 at 186, 191.

Body Irradiator chamber at the clinic for three-and-one-half hours on December 5, 1968. *Id.* at 5. He was then taken to the Low Exposure Total Body Irradiator ("LETBI") chamber. *Id.* at 208. This, his parents were told, would provide the sterile environment necessary for his weakened immune system. Exh. 3 at 76. The Sextons noticed that the device monitoring Dwayne's vital signs bore the symbol of the National Aeronautics and Space Administration and thus learned of NASA's involvement. *Id.* at 103–104; Exh. 4 at 11. Mrs. Sexton also noticed that, despite the representations about the chamber's sterile environment, the clinic maintained some mice in the same general area. Exh. 1 at 307–09.[3]

Soon after he was placed in the LETBI chamber, Dwayne developed an infection. His condition deteriorated rapidly, and on December 29, 1968 he died of uncontrollable staphylococcus aureus and streptococcal infections circulating through his bloodstream. Exh. 4 at 206.

This lawsuit was precipitated by the activities in the spring of 1981 of an investigative journalist on the staff of Jack Anderson. In that period he and the Sextons were in frequent communication, by telephone, interview, and correspondence. *See generally* Exh. 1 at 206–53, 264–76. By some time that spring the Sextons came to take a far dimmer view of Dwayne's treatment than they formerly had. *Id.* at 198, 204. To some extent the parties invite us to engage in a sort of photo-finish analysis—did the Sextons, by June 14, 1981, have sufficient knowledge so as to be out of time in giving notice on June 14, 1983? Under our view of the law, however, they had acquired enough knowledge by December 1968, mooting the issues theoretically raised by the events of 1968–81.

## II

Plaintiffs claim negligence by the government doctors at Oak Ridge (and by those in control of the program there). Their complaint states that the doctors conducted "unethical and improper medical experimentation involving nuclear radiation" on Dwayne and Mrs. Sexton, and treated them as "human guinea pigs without their or Mr. Sexton's full knowledge or informed consent." J.A. at 12. Their complaint describes the resulting injuries as follows:

> Dwayne suffered extreme physical, emotional, and psychological damage from the experiments conducted on him, was deprived of his best chance of survival, and died at the age of six. Mary Sue Sexton also suffered severe physical, emotional, and psychological damage from her participation in the experiment and, among other things, was unknowingly exposed to the risk of contracting Dwayne's leukemia. Both she and Dwayne's father, Talmon Sexton, were deprived of their right to decide upon their son's medical treatment and care and suffered severe physical, emotional, and psychological damage watching Dwayne needlessly suffer and die.

*Id.* at 12–13.

■ The FTCA is of course a waiver of sovereign immunity. As § 2401(b) imposes a condition on that waiver, courts "should not take it upon [themselves] to extend the waiver beyond that which Congress intended." *United States v. Kubrick,* 444 U.S. 111, 117–18, 100 S.Ct. 352, 356–57, 62

---

**3.** In her deposition Mrs. Sexton said she had seen the mice in an outpatient area one floor below where Dwayne received treatment, but that she could not tell whether they were directly beneath. *Id.* An Atomic Energy Commission report of April 16, 1974, of which the Sextons received a copy in March 1981, makes clear that the mice were indeed directly beneath, separated from the patient area by a wood floor. The report is highly critical of the clinic's use of this site, on the ground that its use led to animals and animal waste being carried through areas used by patients with little resistance to infec-

tion, and plaintiffs' complaint invokes that criticism. We think that spotting the mice should have put a reasonable person on notice of the possible risks. *Nemmers v. United States,* 795 F.2d 628, 631–32 (7th Cir.1986) (statute starts to run when a reasonable person knows enough to prompt a deeper inquiry into a potential cause); *Arvayo v. United States,* 766 F.2d 1416, 1422 (10th Cir.1985) (same). In any event, Mrs. Sexton received actual notice of the problem no later than March 1981, when she read the AEC's report. Exh. 1 at 214.

L.Ed.2d 259 (1979). *See also Library of Congress v. Shaw,* —— U.S. ——, 106 S.Ct. 2957, 2963, 92 L.Ed.2d 250 (1986).[4]

*Kubrick* itself, the only Supreme Court analysis of § 2401(b), provides our major guidance. The Court held that the statute starts to run (the claim "accrues") by the time a plaintiff "has discovered both his injury and its cause," 444 U.S. at 120, 100 S.Ct. 358, even though he is unaware that the harm was "negligently inflicted," *id.* at 123, 100 S.Ct. at 360. In justifying its approach it noted that Kubrick himself, "armed with the facts about the harm done to him," could "protect himself by seeking advice in the medical and legal community" to determine whether there had been negligence. *Id.* It thus appeared to draw a distinction between the facts about what happened to the plaintiff, on the one hand, and the facts and standards by which those events were to be evaluated, on the other.

Application of this principle was easy in *Kubrick* itself. Kubrick had been treated for an infection with an antibiotic, neomycin, in a Veteran's Administration Hospital. Six weeks later, he noticed hearing problems, which were diagnosed as bilateral nerve deafness. In January 1969 an ear specialist told him that the neomycin probably was the cause of his deafness. Only in June 1971, however, did the plaintiff learn from another doctor that the administration of neomycin likely constituted negligence by the VA doctors. The plaintiff filed suit under the FTCA in late 1972. The Court found the claim barred by § 2401(b), taking the view that the claim accrued when in January 1969 he came into possession "of all the facts about the cause of his injury." *Id.* at 123, 100 S.Ct. at 360. The Court specifically rejected the Third Circuit's theory that "accrual of a claim must await awareness by the plaintiff that his injury was negligently inflicted." *Id.*

Here we must consider the application of *Kubrick* on more complex facts. It seems simple enough to say that the basic injury was death (though plaintiffs resist that, as we shall see), but its cause might be characterized in a variety of ways. To some extent plaintiffs claim that the cause was the government's creation of an unjustifiable risk of infection. So phrased, the claim closely parallels *Kubrick;* the statute began to run in 1968 when plaintiffs learned of the problem and observed Dwayne's death. On the other hand, plaintiffs also claim that the death was caused by failure to give chemotherapy promptly and continuously. This causal connection was obscured, for them, by their supposition that death would normally follow leukemia within three-to-five years of diagnosis. Thus their claim poses the questions of how *Kubrick* applies where (1) the negligence consists of an omission rather than an affirmative act, and especially where (2) plaintiffs' detection of the causal connection is thwarted by their understanding that natural causes would cause death within the relevant time span.

■ We think that neither factor prevents the application of *Kubrick.* Even where the government agents' negligence takes the form of omission, a plaintiff's understanding of the basic nature of the treatment should suffice to begin the statute running. If the plaintiff knows these critical facts, he need only undertake a reasonably diligent investigation to determine whether a cause of action may lie. Suppose, for example, a man is admitted to a hospital with heart problems, and the doctors administer remedies A, B and C. They do not use alternative remedies D, E and F. The man knows nothing of these; he is not a doctor. But, if he dies, his survivors are armed with the knowledge that A, B and C were the only remedies employed. If D was the correct remedy, inquiries in the medical profession should lead the survivors to the discovery. We think that the survivors can properly be said to know the cause of the injury: they know that death resulted from (1) a natural cause (2) treated only by remedies A, B and

---

**4.** Because § 2401 is both a condition of the sovereign's waiver of immunity and a federal jurisdictional provision, it must be interpreted solely by reference to federal law. *Zeleznik v.*

*United States,* 770 F.2d 20, 21 (3d Cir.1985), *cert. denied,* 475 U.S. 1108, 106 S.Ct. 1513, 89 L.Ed.2d 913 (1986).

C. If the statute in such cases began to run only when they learned of the erroneously omitted remedy, it would be deferred indefinitely in a large range of cases where plaintiff had the information that we think *Kubrick* regarded as critical: the historical facts associated with the injury itself.

We think it significant that here plaintiffs stress as the key point of information—or at least a key point of information—the fact that chemotherapy could be administered simultaneously with radiation therapy. (They learned this in September 1981.) Exh. 4 at 4–5. But of course this is information supplied by "the medical community"—and therefore, according to *Kubrick*, not needed to trigger the running of the statute. *See* 444 U.S. at 123–24, 100 S.Ct. at 360.

This reading agrees, we believe, with that of other courts of appeal that have addressed the issue. In *Arvayo v. United States*, 766 F.2d 1416 (10th Cir.1985), for example, a government doctor initially diagnosed a baby's ailment as a mere upper respiratory infection; next day a different doctor at the facility correctly diagnosed it as meningitis. The child suffered severe brain injury as a result of the delay in treatment. The Tenth Circuit rejected the plaintiff's argument that the statute did not begin to run until they learned that even a brief delay in the proper treatment of meningitis could cause the damage. Rather, the court held that once the plaintiffs knew the bare facts that doctors treating their son had made two different diagnoses of their son's ailment within twenty-four hours, they were under a duty to inquire into the medical treatment of their child to determine if the misdiagnosis might have been a cause of his injuries.

Indeed, courts have found adequate knowledge of injury and cause in situations where plaintiffs' knowledge was far more limited as to the character of the government agents' omission. For example, in *Zeleznik v. United States*, 770 F.2d 20 (3d Cir.1985), *cert. denied*, 475 U.S. 1108, 106 S.Ct. 1513, 89 L.Ed.2d 913 (1986), plaintiffs' son was murdered by an inmate recently released from a state psychiatric hospital.

No connection to the United States Government appeared until they learned that after the release the murderer had sought to give himself up to the Immigration and Naturalization Service, which had declined to take him in. The court adopted the view that "the 'cause' is known when the immediate physical cause of the injury is discovered." 770 F.2d at 23. It relied on *Dyniewicz v. United States*, 742 F.2d 484, 486–87 (9th Cir.1984), which held that plaintiffs' awareness that a highway flood had swept decedents to their deaths was enough; their ignorance of any involvement of the National Park Service (which had failed to close the road) was irrelevant.

The omission/commission divide seems largely elusive. In *Dyniewicz*, for example, plaintiffs could be described as unaware of the Park Service's failure to close the road; alternatively, they could be described as knowing that the road was open (and thus, inevitably, that no one with capacity to close it had done so). In the present case, plaintiffs knew that their son had died under a particular program of treatment (and thus, inevitably, that all alternatives had been omitted). We do not think the scope of *Kubrick* is to turn on such verbal twists.

Plaintiffs' expectation that their son would die of leukemia in three-to-five years is more troubling. These circumstances, they essentially argue, lulled them into the view that the leukemia was a completely sufficient cause of death, so that Dwayne's death did not make them aware of any "injury." Accordingly, they had no basis for inquiring about the sufficiency of treatment.

The argument is appealing. It is constructed as drawing a clear line between deaths which suggest the need for inquiry and deaths which do not. We think that in the real world the line is not so bright. Certainly many thousands of people each year must learn that they are suffering from a disease for which the prognosis is very dim. Most of them presumably die within a moderate time span, but others soldier on for much longer than could be expected, sometimes even making complete

recoveries. Where death occurs, we may assume that survivors have been lulled into complacency as to the character of the medical care provided. Thus acceptance of plaintiffs' theory would defer the running of the statute on a broad range of claims and would generate intractable factual disputes as to just how dismal a prognosis must be to bring plaintiff within the rule's shelter.

Nor do the cases seem to us to support such an exception. In *Green v. United States*, 765 F.2d 105 (7th Cir.1985), plaintiff received radiation therapy for oral cancers and thereafter suffered osteoradionecrosis of the jaw—a recognized side effect of such treatment. He claimed, accordingly, that he suffered no "injury" within the meaning of *Kubrick* until the injuries exceeded the expected side effects. *Id.* at 107. Without inquiry into the exact level of injury that Green might have expected, the court held that the severity of the injuries was enough to cause "a reasonably diligent claimant to seek advice in the medical and legal community." *Id.* at 108. *See also Dessi v. United States*, 489 F.Supp. 722, 725 (E.D.Va.1980) (plaintiff's belief that injury is unavoidable does not toll statute or excuse plaintiff from undertaking inquiry).

*Rispoli v. United States*, 576 F.Supp. 1398 (E.D.N.Y.1983), *aff'd without opinion*, 779 F.2d 35 (2d Cir.1985), *cert. denied*, 474 U.S. 1069, 106 S.Ct. 829, 88 L.Ed.2d 800 (1986), provides limited, and we think only superficial, support for plaintiffs. A car ramming into plaintiff's hot dog stand severely injured his leg, for which he underwent surgery in a VA hospital. On removing his cast, he discovered that the heel and top of his foot "had come off completely." *Id.* at 1400. (The court gives no more detail, but we infer from the discussion summarized below that this was less drastic than it initially sounds.) The government claimed the statute started to run at the moment of these discoveries. But before the operation the doctors told the plaintiff he could expect severe pain and complications; after removal of the cast they told him that "the open wounds would be treated with wet dressings and would

heal," *id.* at 1400; and post-operative treatment of one kind or another went on for months (up to a point less than two years before filing of the claim). Without much analysis of *Kubrick*, the court rejected the moment of cast removal as controlling. Of course the case is similar to the present one in terms of the plaintiffs' very low-level expectations. But the court clearly viewed the doctors' assurances of potential cure as leading plaintiff to believe that the condition could be largely corrected. Obviously Dwayne's death precludes a finding that plaintiffs could have entertained any such expectation.

Plaintiffs rely heavily on *Drazan v. United States*, 762 F.2d 56 (7th Cir.1985), which is not only the case most favorable to them but also the most forcefully argued. Government doctors discovered a malignant tumor through an x-ray of the plaintiff's husband during a routine checkup. They failed to inform the patient or in any way follow up on the diagnosis. Sixteen months later, the man died as a result of the tumor. The district court held that when her husband died, she knew the injury (death) and the cause (lung cancer), so that under *Kubrick* the statute started to run at death. The court of appeals reversed, holding that the starting date is "when the government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered the government cause—whichever comes first." *Id.* at 59. Writing for the court, Judge Posner argued that the district court's approach would lead to "rather ghoulish" consequences: whenever anyone suffered pain, injury or death in a government hospital, he or his survivors would request his record "to see whether diagnosis or treatment might have played a role in his distress." *Id.*

First, we think *Drazan* plainly distinguishable. The husband's death itself gave no clue as to the positive x-ray 16 months before (and, therefore, no clue as to the government's neglect in failing to take action). Unlike the present case, plaintiff

there had neither knowledge nor reason to know of the key omission. There is no reason to suppose that, if she had sought "advice in the medical and legal community" based on the facts of his death and his *known* treatment, anyone would have responded with information leading to the overlooked x-ray. *Cf. Simmons v. United States*, 805 F.2d 1363 (9th Cir.1986) (statute tolled because plaintiff had no reason to suspect that romantic affair with government psychiatrist was connected with emotional injury which surfaced three years later).

Second, we note that the precise "ghoulish" consequence involved in *Drazan* does not at all flow from the principle adopted here. Plaintiffs situated as were the Sextons need only seek information outside the hospital, to *evaluate* the known facts, in order to find out whether the doctors omitted a clearly superior alternative treatment. They need not seek to ransack hospital records.

Third, any statute of limitations that puts inquiry burdens on a plaintiff, as this one clearly does, *see Kubrick*, 444 U.S. at 123 & n. 10, 100 S.Ct. at 360 n. 10, entails a degree of ghoulish behavior. Patients or survivors, whose instinct may well be to shut off from their minds the grim experience through which they have passed, are required instead to follow up on their leads. For persons of any sensitivity this must be a difficult or even repugnant process. Yet, to protect defendants from stale claims, legislatures put potential plaintiffs to the hard choice of proceeding with such inquiries or risking loss of possible claims.

Finally, as the *Drazan* case was argued before the same panel as *Green,* and on the same day, and both were unanimous, it clearly cannot be taken to relieve plaintiffs of seeking medical and legal evaluation when they suffer severe injury while under medical treatment, even when, as here and in *Green,* the outcome after treatment is largely to be expected.

Other cases cited by the appellants are similarly inapposite. Both *Hobson v. Wilson,* 737 F.2d 1 (D.C.Cir.), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1984), and *Barrett v. United States,* 689 F.2d 324 (2d Cir.), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1982), were cases in which the plaintiffs alleged fraudulent concealment of negligence by the government. The appellants have made no allegation of such concealment here, and the record does not disclose the types of affirmative acts of concealment necessary to bring that doctrine into play. *See Davis v. United States,* 642 F.2d 328, 332 (9th Cir.1981) (failure of government to disclose fact of its own negligence does not constitute fraudulent concealment).

In *Ware v. United States,* 626 F.2d 1278 (5th Cir.1980), the government had destroyed the plaintiff's cattle because it thought them diseased. The Fifth Circuit held that the claim did not accrue until the plaintiff discovered that some of the cattle had in fact been healthy. The opinion does not reveal either how plaintiff learned of the misdiagnosis, or whether he could in the course of reasonable inquiry have learned earlier. In any event, in selecting the date of discovery of the misdiagnosis as controlling, the court stated that *Kubrick* was inapplicable because the case was not one of medical malpractice. *Id.* at 1284 n. 4. While we cannot claim fully to grasp the decision, it is plainly not an effort to construe *Kubrick,* which is our task.

*Waits v. United States,* 611 F.2d 550 (5th Cir.1980), supports appellants but is in our view inconsistent with *Kubrick.* Plaintiff contracted a leg infection in a VA hospital; his brother-in-law, a general practitioner, whisked him out of the hospital because of his concern over its failure to treat the leg properly. Plaintiff did not file his claim until more than two years after he left the hospital. The court allowed the claim, believing the statute not to run until plaintiff had "notice of the wrong," *id.* at 552, "notice of the existence of a viable claim," *id.,* or "knowledge of negligence," *id.* at 553. This is not the *Kubrick* approach.

Finally, in *Stoleson v. United States,* 629 F.2d 1265 (7th Cir.1980), the court found that plaintiff could not have learned that her exposure to nitroglycerin caused her

angina until April 1971, the date of the first article ever identifying such a causal connection. Plaintiffs here of course make no such claim; their theory is that the government doctors negligently denied Dwayne treatment that they then knew or ought to have known was better. (The *Stoleson* court evidently found negligence in the government's failure to observe certain safety precautions required to be undertaken in facilities where workers were exposed to nitroglycerin. *Id.* at 1271.)

Plaintiffs also assert some injuries that did not *occur* until 1981, notably the emotional harm that they suffered on learning of the government's alleged malfeasance. *See* Appellants' Brief at 28–29. While we recognize the anguish of coming to believe that your son's death was perhaps unnecessary (or unnecessarily painful), we cannot accept the idea it constituted an independent injury within the meaning of *Kubrick*. As receipt of such news is by definition co-extensive with the discovery of negligence, viewing it as an "injury" would overturn *Kubrick*.

### CONCLUSION

Plaintiffs were aware by Dwayne's death in 1968 of all the critical historical facts of their injury and of the government's role in treatment. Armed with these facts, they could have sought advice that would have enabled them to evaluate the government's acts and omissions. As they failed to present a claim within two years, their action is barred by 28 U.S.C. § 2401(b). Accordingly, the judgment of the district court is affirmed.

*So ordered.*