**Jill E. CRAGIN, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 86–0035–P.

United States District Court, D. Maine.

April 19, 1988.

---

Patrick N. McTeague, Thomas R. Watson, McTeague, Higbee, Libner, Reitman MacAdam & Case, Topsham, Me., for plaintiffs.

Laura D. Millman, Trial Atty., Jeffrey Axelrad, Director, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., David R. Collins, Asst. U.S. Atty., Portland, Me., for defendant.

## OPINION AND ORDER

GENE CARTER, District Judge.

### I. Introduction

Plaintiff Jill Cragin brings this action, through her parents, Virginia and John Cragin, to recover damages for neurological injury she suffered during a bout with pneumococcal meningitis in 1969. She claims her meningitis was caused by a DPT vaccine administered by a United States Navy physician two weeks before the onset of the disease. She claims her meningitis was exacerbated by an eight-hour delay in diagnosis and treatment, and by the subsequent administration, again by U.S. military medical personnel, of two more vaccines.

The United States claims that Jill is barred by the applicable statute of limita-

tions from raising her claim 16 years after the alleged wrongdoing. It claims, in the alternative, that the first DPT vaccine did not cause Jill's meningitis or weaken her natural immunity to the disease. It claims that no unjustifiable delay in diagnosis or treatment exacerbated Jill's meningitis. It claims, finally, that the two repeat vaccines were appropriately administered and did not worsen Jill's neurological injury.

The case was tried before this Court December 28, 1987 through January 4, 1988. The Court's findings of fact and conclusions of law follow.

## II.  Factual Chronology

Jill Cragin was born August 24, 1969, the fourth daughter of John and Virginia Cragin. Like her sisters, Jill was born, and was treated throughout her childhood, at military medical institutions. Her delivery and early infancy were medically unremarkable.

On October 14, 1969, during a well-baby examination in the dispensary at the Naval Weapons Station, Yorktown, Virginia, Jill was inoculated with a DPT vaccine (diphtheria, pertussis, tetanus). In the early evening, she developed a fever of 103 degrees and refused food. After an alcohol bath, her fever dropped to 100 degrees, and her mother put her to bed.

She awoke on October 15 with a fever that increased to 103 degrees by early evening. Mrs. Cragin called the Weapons Station dispensary. When the doctor on call called back, Mrs. Cragin reported Jill's immunization the day before, her fever and lack of appetite. The doctor suggested that the fever was a reaction to the DPT shot, and recommended that Mrs. Cragin administer Liquiprin, an over-the-counter fever medication.

Mrs. Cragin gave Jill regular doses of Liquiprin from October 16 through October 20. Jill continued during that time to have a mild fever and reduced appetite. She also developed diarrhea, and had periodic episodes of stiff limbs.

On October 20, when Jill's condition had not improved, Mrs. Cragin again called the Weapons Station dispensary and reported that Jill had been immunized on October 14 and had had reaction-like symptoms ever since. The doctor with whom she spoke suggested that Jill had a mild virus and recommended that Mrs. Cragin change Jill's diet from solid food and regular formula to a soy formula. Mrs. Cragin followed the doctor's instructions. The doctor did not see Jill.

During the next week, October 21–28, Jill's diarrhea diminished. Her limbs still stiffened occasionally, and she smiled or reacted only to increased stimulation. Her eyes were frequently fixed; she did not react as readily to visual stimulation.

On October 29, Jill at one point stiffened radically, arching her back, then collapsed into her mother's arms. She slept with unusual frequency during the day, and by late afternoon, had a fever of 101 degrees. She refused her dinner, and was put to bed. She didn't awaken for her usual 10 p.m. feeding. When Mrs. Cragin woke her with considerable difficulty at 11 p.m., she had a fever of 105 degrees, was whining in an odd, high-pitched voice, and was flailing and stiffening her limbs and back.

Mrs. Cragin again called the Weapons Station dispensary. When Dr. Roger Williams called back, Mrs. Cragin reported Jill's fever, odd noises and rigid body, and urged the doctor to see Jill. Dr. Williams recommended that the Cragins reduce Jill's fever and bring Jill into the dispensary the next morning. The Cragins bathed Jill in ice water, reducing her temperature to 102 degrees.

Jill's high-pitched whining continued through the night. Her eyes rolled in her head, and she did not acknowledge her mother's presence. When the Cragins brought Jill to the Weapons Station dispensary at 7:45 a.m. on October 30, she was stiff and her eyes were fixed. Dr. Williams examined her, took a brief medical history and blood samples, and immediately recommended that Jill be transferred to the McDonald Army Hospital at Ft. Eustis, Virginia. Dr. Williams gave Mr. Cragin a sealed envelope containing Jill's medical records, instructing him to deliver it to

the attending physician at Ft. Eustis. Mr. Cragin did not open the envelope.

At McDonald Hospital, the Cragins again gave Jill's medical history, reporting the DPT shot and her reactions to it, and the two weeks of symptoms preceding October 30. Jill was examined and admitted. A lumbar puncture was performed. From the results of the puncture and of the blood tests performed at the Weapons Station dispensary, Jill was diagnosed as having pneumococcal meningitis, and was immediately treated with antibiotics.

Jill's rigorous antibiotic treatment continued at McDonald Hospital until November 3, when Jill was transferred to the Portsmouth Naval Hospital at Norfolk, Virginia. Dr. Robert Vanderberry assumed responsibility for Jill's treatment at Portsmouth Hospital, continuing her antibiotics and monitoring her recovery from meningitis. By November 14, when Dr. Vanderberry declared that Jill had recovered from her meningitis, Jill had suffered serious neurological injury. Dr. Vanderberry recommended nevertheless that she be inoculated with the second DPT shot in the three-shot series.

On November 16, Dr. Vanderberry and the Cragins discussed the cause of Jill's meningitis and the propriety of a second vaccine. In their search for answers about their daughter's illness, the Cragins asked Dr. Vanderberry whether Jill's first DPT vaccine had caused or contributed to her meningitis. Dr. Vanderberry assured the Cragins that Jill's meningitis was not linked to her first DPT shot, and suggested that her risk of contracting diphtheria, pertussis or tetanus was greater than the risk of serious side effects from a second shot. Satisfied with the doctor's assurances, the Cragins authorized the second shot, and Dr. Vanderberry administered it.

Jill was discharged from Portsmouth Naval Hospital on November 19, displaying what the Cragins termed an overall failure to thrive. On November 26, Mrs. Cragin called Dr. Williams at the Weapons Station dispensary to report that Jill's fever and diarrhea had returned. Dr. Williams requested that the Cragins bring Jill to Ft. Eustis, where comprehensive records of Jill's illness were stored. Jill was examined at Ft. Eustis on November 26, and again on December 4 and December 8, for a series of relatively minor troubles.

On December 19, the Cragins met again with Dr. Vanderberry at the Portsmouth Naval Hospital. He examined Jill and suggested that the eye twitching her parents reported her having was a sign of residual seizure activity, a lingering side effect from the drastic neurological damage she had suffered from her meningitis. He administered the third and final DPT vaccine. Jill's eye twitching continued for approximately a month after her third shot, even in her sleep. She continued to have diarrhea and other symptoms.

In May, 1970, the Cragins were transferred to Portland, Maine. Before they left, they met again with Dr. Vanderberry, who recommended that Jill undergo a complete neurological examination after the Cragins settled in Maine. He sealed Jill's medical records in an envelope and sent them with the Cragins. The Cragins never opened the envelope.

Jill underwent a comprehensive neurological exam at Children's Hospital in Boston, Mass., on August 18 and August 24, 1970. Doctors there diagnosed Jill as severely and permanently brain damaged and recommended that the Cragins institutionalize her. They refused, brought her home and provided or arranged for the therapy and treatment Jill needed themselves. They continue to do so today.

After Dr. Vanderberry assured them on November 16, 1969, that Jill's first DPT shot did not cause her meningitis, the Cragins dismissed any connection between the shot and the disease until July 26, 1983. On that date, Mr. Cragin watched a Mac-Neil–Lehrer Report linking the pertussis portion of the DPT vaccine to serious side effects and neurological damage. Mr. Cragin immediately searched Jill's medical records, which he had stored unopened since 1970, for any sign of a causal connection between Jill's shot and her meningitis. He discovered, for the first time, that Jill's medical records contained no account of the

two weeks of symptoms she suffered prior to being diagnosed with meningitis on October 30, 1969, and no record of the serious symptoms Mrs. Cragin had reported to Dr. Williams on October 29, 1979.

Mr. Cragin sent for a transcript of the MacNeil–Lehrer Report, and for a copy of testimony given before a U.S. Senate Committee on the dangers of pertussis vaccines. Over the next eighteen months, he researched the possible connection between Jill's DPT shot and the meningitis that caused her neurological damage. In 1985, he sent for, then read, "DPT—A Shot in the Dark," a book detailing the perceived side effects of DPT vaccines. The book described meningitis and an odd, high-pitched cry as reactions recorded in other vaccine recipients. He concluded, from the information in this book, the MacNeil–Lehrer Report and his own examination of Jill's medical records, that there was a link between Jill's DPT shots and her meningitis, and that Dr. Williams should have seen Jill on October 29, 1969, when Mrs. Cragin first reported Jill's severe symptoms.

On June 12, 1985, Mr. Cragin filed an administrative claim with the United States Navy, seeking to recover for Jill's injuries. The Navy failed to enter a final disposition on Plaintiff's claims within six months of filing.[1] The Cragins were therefore permitted, by Title 28 U.S.C. § 2675(a), to seek civil recovery for Jill's injuries. On January 13, 1986, the Cragins filed the instant action on Jill's behalf.[2]

### III. Findings of Fact and Law
### A. Statute of Limitations

Defendant claims that Plaintiffs are barred from bringing this action because they failed to file their administrative claim within the two-year statute of limitations applicable to tort claims against the United States.[3] Defendant claims that because

the Cragins were informed on October 15, 1969, that Jill's fever was a reaction to her DPT vaccine, they had enough facts to suspect a link between the DPT shot and Jill's illness. Defendant claims, further, that because the Cragins knew that Dr. Williams had declined to see Jill on October 29, and that Jill was diagnosed with a medically disastrous illness less than 12 hours later, they had enough facts to suspect an improper delay in treatment.

This, Defendant claims, imposed upon the Cragins a duty to investigate the perceived causal connection between the shot, the delay and the meningitis, to seek advice as to the propriety of Jill's care, and to institute an administrative claim if the facts so warranted. Their failure to do so in 1970 or 1971, Defendant claims, bars them from doing so now.

Plaintiffs claim, in contrast, that they dismissed the thought that Jill's inoculation caused her meningitis when Dr. Vanderberry assured them, on November 16, 1969, that it did not. They claim they never again suspected a causal link until John Cragin watched the MacNeil–Lehrer Report in 1983. They claim that it was not until John Cragin had, in response to the MacNeil–Lehrer Report, researched Jill's medical records and the available studies on pertussis vaccines, and read "DPT—A Shot in the Dark" in 1985, that they had enough facts to warrant bringing an administrative claim against Defendant.

Plaintiffs claim, in addition, that they did not suspect that Dr. Williams' failure to see Jill on October 29, 1969, was negligent until after they had filed their administrative claim and consulted an attorney. This lack of information, they assert, relieved them of the duty to inquire into the propriety of the delay within the two-year statute of limitations.

---

**1.** Defendant admits this in its Answer to Plaintiff's Amended Complaint, at page 4.

**2.** The trial record does not reflect what, if any, action was ever taken on the Cragins' administrative claim. Defendant does not claim that Plaintiffs have failed to exhaust available administrative remedies.

**3.** Title 28 U.S.C. § 2401(b) states:
   "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues."

The Court confronted the statute of limitations issue upon Plaintiff's Motion for Relief from Judgment, and again upon Defendant's Motion for Summary Judgment. The Court concluded in each instance that there existed genuine issues of material fact as to when the Cragins' cause of action accrued, and that early disposition on the basis of the statute of limitations claim was therefore unwarranted. After analyzing the evidence adduced at trial and the law governing the application of the two-year statute of limitations, the Court is convinced that the Cragins' claim was, in fact, untimely, and that this action is therefore barred by the statute of limitations.

## I. Analysis

■ In general, statutes of limitations governing the filing of claims against the United States are to be strictly construed. *Dunn v. United States*, 775 F.2d 99 (3rd Cir.1985). The Federal Tort Claims Act (FTCA), 28 U.S.C. § 2401(b), bars any tort claim against the United States unless it is presented in writing to the appropriate federal agency "within two years after such claim accrues." In determining whether an action has been filed within the two-year statute, therefore, the threshold inquiry is when the cause of action accrued.[4] The U.S. Supreme Court has held that a cause of action "accrues" within the meaning of § 2401(b) when the plaintiff knows both of the existence of the injury and of its probable cause. *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). In the instant case, the critical determination is when the Cragins knew that Jill had been injured, and knew the probable cause of her injury.

The Court must first identify the "injury" for which Plaintiffs seek to recover. It is not merely the meningitis Jill contracted in October, 1969, but the grave neurological damage she suffered in 1969 and continues to endure today. Plaintiffs knew by November 16, 1969, when Dr. Vanderberry recommended a repeat vaccine, that Jill had suffered severe brain damage during her bout with meningitis. They discovered the full extent of that brain damage in August, 1970, after Jill underwent a comprehensive neurological examination at Childrens' Hospital, Boston. There is little dispute that the Cragins knew of the existence of Jill's injury within two years of its occurrence.[5]

It is harder to pinpoint their knowledge of the *cause* of Jill's injury, especially where that cause remains the subject of vigorous professional dispute. The Government claims that Jill's meningitis alone caused her neurological damage, and that the Cragins therefore knew the cause of Jill's injuries when she was diagnosed with meningitis. Knowledge of the bare historical facts associated with the injury— the chronology of symptoms and treatment, without more—has been held sufficient knowledge of "cause" to start the statute of limitations running, even where, as here, the governmental negligence alleged is an omission rather than an affirmative act. *See Sexton v. United States*, 832 F.2d 629, 633 (D.C.Cir.1987) (plaintiff's understanding of basic nature of treatment should suffice to begin statute running, even where governmental negligence takes form of omission).

Plaintiffs claim, in contrast, that Jill's neurological damage was caused by the interplay of her meningitis, the delayed

---

4. Because § 2401(b) is both a condition of the United States' waiver of immunity and a federal jurisdictional provision, it must be interpreted solely by reference to federal law. *Sexton v. United States*, 832 F.2d 629, 633, n. 4 (D.C.Cir. 1987), quoting *Zeleznik v. United States*, 770 F.2d 20, 21 (3rd Cir.1985), cert. denied, 475 U.S. 1108, 106 S.Ct. 1513, 89 L.Ed.2d 913 (1986).

5. This distinguishes the Cragin case from cases in which the statute of limitations was tolled because the injured party simply could not have known, within the two-year limitations period, that he or she had suffered an injury. *See Urie*

*v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (claim arising from silicosis did not accrue until illness manifested itself by disabling claimant, illness being unknown and unknowable before then); *Quinton v. United States*, 304 F.2d 234 (5th Cir.1962) (in 1956, plaintiff given transfusion with Rh positive rather than Rh negative blood. Error not discovered until 1959, when plaintiff gave birth to stillborn child. Cause of action found to accrue in 1959, because injury could not have been discovered before that time).

diagnosis and treatment, and the administration of repeat vaccines. Although they acknowledge that they knew the clinical medical cause of Jill's injury when Jill was diagnosed with meningitis, they claim they were unaware of the negligence until at least 1983, when Mr. Cragin learned of the perceived link between DPT vaccines and neurological injury, and as late as 1985, when he learned of the dangers of delayed diagnosis and treatment. Because, in their view, the medical negligence was as significant a cause of Jill's injuries as the meningitis itself, Plaintiffs claim they were not aware of the "cause" of Jill's injuries, within the *Kubrick* rule, until 1983.

This broader interpretation of "cause," acknowledging both medical and human factors, has gained equal acceptance among the circuits. *See Arvayo v. United States*, 766 F.2d 1416, 1420 (10th Cir.1985) (*Kubrick* supports reading "cause" to mean more than mere awareness of medical cause in cases involving failure to diagnose, treat or warn. "Cause" can mean both natural medical cause and intervening human cause); *Drazan v. United States*, 762 F.2d 56 (7th Cir.1985) (for Federal Tort Claims Act limitations purposes, when there are two causes of injury and only one is attributable to the government, knowledge required to set statute of limitations running is knowledge of government cause, not just of other cause).

Plaintiffs here have failed to establish, however, that the governmental negligence they allege did, in fact, cause or exacerbate Jill's injuries, and thereby warrant extending the limitations period until they discovered it. The evidence adduced at trial established conclusively that meningitis is a medical emergency and that, particularly in infants, early diagnosis and treatment is critical. The medical experts agreed that a delay in treatment could aggravate the neurological damage a meningitis patient suffers. The experts could only speculate, however, that Jill would have suffered less neurological damage had she been seen and treated earlier.

The evidence linking Jill's neurological damage to other alleged causes is even more tenuous. Neurology experts testified that, because of the virulence of meningitis, particularly in infants, it is medically inconceivable that Jill's first DPT shot caused her meningitis. Although one expert testified that the first DPT shot may have weakened Jill's immune system, making her susceptible to meningitis infection, other experts resoundingly refuted the theory that the vaccine increases a patient's vulnerability to infection, in fact testifying that the opposite is true. Experts testified further that Jill suffered no adverse reactions to her second and third DPT vaccines, and that no medical evidence supports the theory that the repeat shots delayed her recovery from meningitis or aggravated the side effects Jill suffered as a result of it.

Thus, unlike in *Arvayo*, where the trial court found that the plaintiffs' child would not have suffered disabling neurological damage had government doctors properly diagnosed and treated his meningitis, Plaintiffs here have failed to establish a clear causal link between the DPT shots, the delay in treatment, and Jill's neurological injury. A narrow reading of case law would lead the Court to conclude, at this point, that the Cragins knew the cause of Jill's injury when they learned of Jill's meningitis, and that their cause of action therefore accrued in 1969.

The Court is prepared to assume, however, that Plaintiffs *had* offered sufficient evidence to show that the government's negligence contributed to Jill's neurological injuries. Unfortunately, this does not change the Court's conclusion that the Cragins' claim was untimely.

Plaintiffs claim they did not know of the negligent causes of Jill's injuries until at least 1983, when Mr. Cragin saw the Mac-Neil–Lehrer report linking DPT vaccines with neurological damage. The Government does not dispute this. The Government does contend, however, that the circumstances surrounding Jill's illness and subsequent brain damage imposed upon the Cragins a duty to ask about the propriety of Jill's treatment and the availability of any legal recourse, before the two-year

statute of limitations expired. Their failure to do so within two years of Jill's injuries, the Government contends, bars them from raising the claim now. The Court agrees.

*Kubrick* laid down the generally applicable rule that after plaintiffs know of the injury at issue and its probable cause, they bear the responsibility of inquiring among the medical and legal communities whether the treatment they received was proper or warranted legal action. 444 U.S. at 122, 100 S.Ct. at 359. As discussed, the Court is assuming for the purposes of analysis that Plaintiffs did *not* know the full cause of Jill's injury until 1983. On its face, therefore, the *Kubrick* duty to inquire did not operate against Plaintiffs before 1983.

Subsequent cases interpreting the § 2401(b) statute of limitations have, however, expanded the *Kubrick* rule. In *Harrison v. United States*, 708 F.2d 1023 (5th Cir.1983), the Fifth Circuit ruled that the § 2401(b) statute of limitations begins to run when the facts available to plaintiffs would lead a reasonable person to seek professional advice as to the propriety of the care given and the existence of a causal link between that care and the injury at issue. 708 F.2d at 1027. The Circuit Court for the District of Columbia Circuit has ruled that "[e]ven where the government agents' negligence takes the form of an omission, a plaintiff's understanding of the *basic nature* of the treatment should suffice to begin the statute running. If the plaintiff knows these critical facts, he need only undertake a reasonably diligent investigation to determine whether a cause of action may lie." *Sexton v. United States*, 832 F.2d at 633 (emphasis added).

Severe side effects alone have been deemed sufficient to cause a "reasonably diligent claimant to seek advice in the medical and legal communities," *even* where such severe side effects are anticipated. *Sexton v. United States*, 832 F.2d at 635, quoting *Green v. United States*, 765 F.2d 105 (7th Cir.1985). Even more specifically, the Tenth Circuit has ruled in *Arvayo* that the plaintiffs' bare knowledge that their son was diagnosed on one day with an upper respiratory infection, and on the next with bacterial meningitis, was enough to impose upon them a duty to inquire into the propriety of their son's care. 766 F.2d at 1422. That court found it appropriate to extend *Kubrick* under the circumstances to require plaintiffs to inquire, within two years of the injury at issue, as to both causation and negligence; that is, to ask whether doctors had breached a duty owed to their son, and whether that breach caused or aggravated their son's brain damage. 766 F.2d at 1421.

■ In this case, the Cragins knew Jill had been sick for two weeks following her first DPT shot, and preceding her bout with meningitis. They knew that she had been violently ill on the night of October 29, 1969, to a degree that frightened them both. They knew that they had reported Jill's symptoms to Dr. Williams, and that Dr. Williams had assured them that if they reduced Jill's fever, they could wait until morning to bring her in. They knew that when they brought Jill in to the Weapons Station dispensary the following morning, Jill was declared *in extremis* and was rushed to McDonald Army Hospital, where she was diagnosed as having pneumococcal meningitis. And they knew, finally, that her brain damage was due, in large extent, to the meningitis. These circumstances, the Court is convinced, imposed upon them a duty to ask, within two years of Jill's illness, whether Jill's treatment was proper or warranted legal action.

The Court's inquest does not end here, however. The Court must determine whether the Cragins fulfilled that duty; whether they exercised reasonable diligence in inquiring into the cause of Jill's injuries. To begin this determination, the Court distinguishes between the two prongs of inquiry involved here. First, did the Cragins ask whether Jill's DPT shots, both before and after her meningitis, were linked to her meningitis? Clearly, they did.

■ On November 16, 1969, the Cragins met with Dr. Vanderberry to discuss the cause of Jill's meningitis and the propriety of repeat vaccines. At that meeting, the Cragins asked Dr. Vanderberry whether

Jill's first DPT shot had caused her meningitis. He assured them that it had not. They then asked whether it was appropriate to administer repeat vaccines, given the neurological trauma Jill had suffered during her meningitis. He assured them that it was.

The Cragins therefore fulfilled—or at least made strides toward fulfilling—their obligation to inquire into the causal link between Jill's DPT shots and her neurological damage. That the information they received convinced them not to initiate legal action does not change the legal effect of their inquiry. For it is the fact that an inquiry was made, and not the nature of the advice given, that starts the statute of limitations running. *Kubrick*, 444 U.S. at 124, 100 S.Ct. at 360. Whether the Cragins were advised that they had been wronged, or on the contrary that the treatment Jill received was appropriate, and whether that advice was competent or incompetent, they were required to determine within the two-year limitations period whether or not to seek legal recourse against the Government. *Id.* Because they elected not to protect their legal rights by filing a claim that Jill's DPT shots were negligently administered, the statute of limitations has run on this claim and it cannot be raised anew here.

■ Finally, the Court must determine whether the Cragins inquired with reasonable diligence into the propriety of the delay in the diagnosis and treatment of Jill's meningitis. They concede that they did not inquire. Both Mr. and Mrs. Cragin testified at trial that they never inquired into the significance of the delay, or whether it had any adverse effect on Jill's condition, and in fact only learned that a delay in treatment could worsen neurological damage after they had filed their administrative claim in 1985.

The Cragins suggest, however, that personal factors excused them from inquiring into the significance of the delay. First, they claim that their longstanding trust in the military medical system, which kept them from suspecting wrongdoing or questioning doctors' decisions, relieved them from having to inquire into the propriety of the treatment Jill received. *Kubrick* and its progeny establish a clear rule, however, that when the plaintiffs know of the injury, and either know of its cause or have a duty to inquire into its cause, the statute of limitations begins to run whether they suspect wrongdoing or not. *See Kubrick*, 444 U.S. at 124, 100 S.Ct. at 360; *Sexton v. United States*, 832 F.2d at 634; *Arvayo*, 766 F.2d at 1422.

Further, subjective factors such as trust, youth and naivete are irrelevant in determining whether Plaintiffs fulfilled their duty to inquire. This rule is articulated in the Tenth Circuit's decision in *Arvayo*. In that case, the United States District Court for the District of Kansas had excused the plaintiffs' failure to inquire into the significance of a 24–hour delay in their son's treatment for meningitis after finding that plaintiffs were "a young couple, wholly trusting of authority, particularly medical persons." 766 F.2d at 1422.

The Tenth Circuit reversed, finding that the district court had erroneously employed a subjective, rather than an objective, standard to the plaintiffs' duty to inquire under the circumstances. "The question whether the Arvayos were 'reasonably diligent' is of course an objective one," the court wrote. *Id.*

In the instant case, the objective standard requires this Court to ignore the Cragins' faith in military medical care and ask whether a "reasonable parent" in the Cragins' position, knowing what they did about the chronology of Jill's treatment and the severity of her side effects, would have inquired into the propriety of the delay. The Court believes that, under all the circumstances, a "reasonable parent" in the Cragins' position *would* have made some type of inquiry, and that the Cragins' failure to do so falls below the objective legal standard applicable here.

The Cragins also suggest that their failure to inquire into the significance of the delay in treatment is excusable because the inquiry would have been futile. Jill's medical records did not mention Mrs. Cragin's phone call to Dr. Williams on October 29,

or the acute symptoms from which Jill was suffering on that night. As a result, they claim, even if they *had* inquired into the propriety of Jill's treatment, no doctor would have alerted them to the danger of the delay, because no doctor besides Dr. Williams would know it had occurred.

This argument is seriously flawed, for at least two reasons. First, it ignores the fact that the Cragins themselves knew about the delay, and could have informed any doctor from whom they sought advice that it had occurred. The incomplete medical records were only one of at least two resources—the other being the Cragins themselves—from which any doctor could learn of the history of Jill's illness and treatment.

■ Second, and more importantly, the proffered "futility" excuse attempts to shift the applicable legal burden from a duty to inquire to a duty to disclose. This, like the "trust" excuse, was addressed and rejected in *Arvayo:*

> The question is not whether, in hindsight, the Arvayos' inquiry would have been fruitless because the St. Joseph's doctors did not know of Dr. DePoe's diagnosis and the subsequent delay in treatment. The question is simply whether a reasonable person in the Arvayos' position, with the knowledge of two drastically different diagnoses within a 24–hour period, with the concomitant likelihood of brain damage, would have made *some* type of inquiry.

766 F.2d at 1422 (emphasis in original). Again, it is the duty to inquire, and not the perceived ineffectiveness of the inquiry, that sets the statute of limitations running. The fact that a reasonably diligent investigation would not have discovered government negligence is not relevant for the purposes of accrual under the two-year statute of limitations laid out in the FTCA. *Zeleznik v. United States,* 770 F.2d 20 (3rd Cir.1985), cert. denied, 475 U.S. 1108, 106 S.Ct. 1513, 89 L.Ed.2d 913 (1986). As the Tenth Circuit found in *Arvayo,* this Court finds that the Cragins' failure to make any inquiries whatever falls below the objective "reasonable parent" standard that governs this action. *Arvayo v. United States,* 766 F.2d at 1422.

The Court notes that this is not a case where the Cragins could not have discovered that a delay in treatment was potentially dangerous and negligent.[6] Expert testimony adduced at trial revealed that the unanimous medical standard, both in 1969 and today, in Virginia, where Jill was treated, and across the country, is that the immediate treatment of meningitis, especially in infants, is a medical priority of the highest degree. Had the Cragins related the chronology of Jill's treatment, and asked about its propriety, they would undoubtedly have been informed that the delay was a breach of medical standards. From there, they could have protected their legal rights by filing a claim on the basis of the delay, if they thought a claim was warranted.

■ Nor is this a case where intentional concealment of critical records prevented the Cragins from discovering the critical facts of Jill's treatment, or from inquiring intelligently into the propriety of that treatment.[7] The Cragins had first-hand knowl-

---

6. *See,* e.g., *Stoleson v. United States,* 629 F.2d 1265 (7th Cir.1980) (plaintiff suffered angina after exposure to nitroglycerin. First medical study linking nitroglycerin to heart trouble did not appear until after two-year statute of limitations had run. Court found statute tolled until article published, because plaintiff *could not have known* about link before that time, even with appropriate inquiries); *Nicolazzo v. United States,* 786 F.2d 454 (1st Cir.1986) (plaintiff suffered injuries to left side of head in 1969. Incorrectly diagnosed until 1980, when cause of difficulties discovered and remedied. Court found statute of limitations tolled until 1980 because plaintiff *could not have known* about

cause of injury before that time, even with proper inquiries).

7. Where critical facts are concealed, the general rule that a cause of action accrues at the time of injury is set aside and accrual is delayed until the concealed facts are discovered. *Richman v. United States,* 709 F.2d 122 (1st Cir.1983). *See,* e.g., *Drazan v. United States,* 762 F.2d 56 (7th Cir.1985) (patient x-rayed; doctors found malignant tumor, but neither informed patient nor prescribed treatment. Sixteen months later, patient died from tumor. Death revealed no signs of tumor or earlier diagnosis. Court held that accrual was delayed until plaintiff, patient's decedent, learned of earlier diagnosis after x-rays

edge of the delay, and could have detected the omissions on Jill's medical records by looking at them. Their unwillingness to relive the trauma of Jill's illness by looking at the records is, again, a subjective factor that may not enter into the Court's assessment of their diligence in inquiring into their daughter's illness. As the District of Columbia Circuit ruled in *Sexton:*

> Any statute of limitations that puts inquiry burdens on a plaintiff, as [§ 2401(b)] clearly does, entails a degree of ghoulish behavior. Patients or survivors, whose instinct may well be to shut off from their minds the grim experience through which they have passed, are required instead to follow up on their leads. For persons of any sensitivity this must be a difficult or even repugnant process. Yet, to protect defendants from stale claims, legislatures put potential plaintiffs to the hard choice of proceeding with such inquiries or risking loss of possible claims.

832 F.2d at 636 (citations omitted).

### IV. Conclusion

The Court concludes, on the basis of the foregoing analysis, that the Cragins knew of the existence of Jill's neurological damage no later than August, 1970; that they knew the bare chronology of Jill's meningitis, treatment and severe side effects in 1969; that, although they did not learn of the medical negligence until 1983, they had a duty to inquire into the propriety of Jill's care within two years of her neurological injury; that they inquired into the causal link between Jill's first DPT shot and her meningitis, and determined on the basis of their advice that Jill's shot was appropriately administered; that they failed to exercise reasonable diligence in inquiring into the medical significance of the eight-hour delay in Jill's diagnosis of and treatment for meningitis; and that their failure to inquire was not excused by their longstanding trust in military medical care, or by the perception that their inquiries would have

been futile. On these grounds, the Court finds that the Cragins' action on Jill's behalf was not timely, and that it is therefore barred by the statute of limitations.

This conclusion has harsh consequences. But it is an essential conclusion if the statute of limitations in § 2401(b) is to continue to encourage the prompt presentation of claims, and to "protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *Kubrick,* 444 U.S. at 117, 100 S.Ct. at 357.

For the theory advanced by the Cragins—that a cause of action under the FTCA does not accrue until the plaintiffs are informed of the possibility of a causal link between government negligence and the injury for which they seek to recover—could toll the statute indefinitely, hinging the government's right of repose on events as uncontrolled and uncertain as the broadcast of a news report or the publication of a magazine article. This cannot be what Congress intended when it enacted this limitation on the government's waiver of immunity from suit. And it is this Court's bounden duty to hue closely to congressional intent in interpreting and enforcing Congress' enactments. The Court is "not free to construe [§ 2401(b)] so as to defeat its obvious purpose." *Id.*

The Court has had, in this case, the delicate task of balancing private compassion against clearly articulated public policy, and recognizes that its conclusion is, in some respects, disturbing. But, as the United States Supreme Court wrote in *Kubrick:*

> "It goes without saying that statutes of limitations often make it impossible to enforce what were otherwise perfectly valid claims. But that is their very purpose, and they remain as ubiquitous as the statutory rights or other rights to

revealed); *Harrison v. United States,* 708 F.2d 1023 (5th Cir.1983) (tests performed on plaintiff in 1966 to discover source of headaches. Needle inserted into plaintiff's skull mistakenly

punctured plaintiff's thalamus. Plaintiff not informed. X-rays revealing thalamic scar concealed until 1976. Court held statute of limitations tolled until critical x-rays revealed).

which they are attached or are applicable. We should give them effect in accordance with what we can ascertain the legislative intent to have been."
444 U.S. at 125, 100 S.Ct. at 361.

### V. Order

Accordingly, the Court hereby *ORDERS* that judgment in this action be entered for Defendant.