Jose M. ARVAYO, etc., et al.,
Plaintiffs-Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 84–1479.

United States Court of Appeals,
Tenth Circuit.

June 26, 1985.

Rehearing Denied Aug. 13, 1985.

McKay, Circuit Judge, filed dissenting opinion.

Mark B. Hutton, Wichita, Kan. (Andrew W. Hutton, Wichita, Kan., with him on brief), of Michaud, Cordry, Michaud, Hutton & Hutton, Wichita, Kan., for plaintiffs-appellees.

Alleen S. Castellani, Asst. U.S. Atty., Topeka, Kan. (Benjamin L. Burgess, Jr., U.S. Atty., Topeka, Kan., with her on the brief), for defendant-appellant.

Before BARRETT and McKAY, Circuit Judges, and WINDER,* District Judge.

BARRETT, Circuit Judge.

This malpractice case against the United States was commenced by Jose and Tina Arvayo under the Federal Tort Claims Act (FTCA) on behalf of their son, Jose, Jr. Following trial to the court, damages in amount of $1,950,000 were awarded in the Arvayos' favor. 580 F.Supp. 753. The dispositive issue on appeal is whether the administrative claim filed by the Arvayos was timely.[1]

The relevant facts are not in dispute. On January 30, 1979, Tina Arvayo brought Jose, Jr., then five months old, to Dr. DePoe at the McConnell Air Force Base Hospital because he was cranky and had been suffering from a fever for nine days. After briefly examining Jose, Dr. DePoe diagnosed his condition as an upper respiratory infection (URI)—a virus—for which he prescribed Triaminic Concentrate, and directed Tina Arvayo to return with Jose in a week if his condition had not improved.

By 11:00 a.m. the next morning, January 31, 1979, Jose's condition had worsened significantly. His eyes were crossed, and he was suffering from convulsions. Tina Arvayo returned with him to the McConnell

---

* The Honorable David K. Winder, United States District Judge for the District of Utah, sitting by designation.

1. 28 U.S.C. § 2401(b) (1982) provides:
A tort against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim *accrues* or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented. (Emphasis added.)

hospital, where an emergency room physician, Dr. Pascua, immediately recognized that Jose's condition was critical. Preliminarily diagnosing Jose's condition as bacterial meningitis, Dr. Pascua transferred Jose to St. Joseph's Hospital, a civilian hospital, for more specialized care. At St. Joseph's several doctors examined Jose during the course of the afternoon. Their "working diagnosis" of bacterial meningitis was confirmed at approximately 6:00 p.m. after Dr. Butler, who had taken Jose's history from Tina Arvayo earlier that afternoon, performed a spinal tap.

The history taken by Dr. Butler and signed by him and Dr. Abbas, a neurologist primarily in charge of Jose's care at St. Joseph's, reveals that both doctors were aware Jose had been taken to McConnell the day before and had been given Triaminic for treatment. They also were aware that within the prior two weeks, though not the day before, doctors at McConnell had diagnosed his condition as an URI. (R.Vol. 1 at 7; Vol. 15 at 370.)

By August, 1979, the Arvayos were aware that Jose had suffered significant brain damage from the meningitis. Between January, 1979, and August, 1981, however, the Arvayos made no inquiries as to the propriety, or impropriety, of Dr. DePoe's diagnosis and treatment on January 30, 1979. Furthermore, no doctor familiar with the case volunteered such information. In August, 1981, Tina Arvayo consulted her attorney in the present case because she and her husband were dissatisfied with the government insurance coverage of Jose's medical expenses. The attorney was with a medical malpractice firm that had previously handled cases involving delayed diagnosis of meningitis. After informing Tina Arvayo of the possible connection between delayed diagnosis of meningitis and mental retardation, the attorney and his firm were retained to handle the case. Thereafter, on December 16, 1981, the Arvayos filed their administrative claim.

After their administrative claim was denied, the Arvayos brought suit in federal district court alleging that Dr. DePoe's failure to timely diagnose and treat the meningitis was the cause of Jose's retardation. Rejecting as biased the testimony of Government doctors that Dr. DePoe's diagnosis and treatment had not fallen below prevailing community standards, the district court found that Jose was suffering from meningitis on January 30, 1979, that the standard in the community would have been to diagnose the condition, and that had the condition been diagnosed and treated the day before, Jose probably would not have suffered the severely disabling injuries he now lives with. Memorandum and Order, United States District Court for the District of Kansas (February 23, 1984), at 19 [hereinafter "Memorandum Opinion"]. Further, the district court found that "the [Arvayos] were never timely apprised of any reason to suspicion the significance of the event with Dr. DePoe on January 30, 1979, until [Tina Arvayo] visited an attorney in the summer of 1981." Id. at 36. This finding was based upon the court's observation of the Arvayos and conclusion that they were "quite young, wholly trusting of authority, particularly medical persons," and that "[n]o one has suggested any relationship between the child's plight and a delay in diagnosis. It is doubtful if any of the treating physicians had even heard of Dr. DePoe, the extent of his care and treatment; and most assuredly, no one had volunteered a relationship." Id. The district court thus ruled that the cause of action accrued in August, 1981, when the Arvayos were informed of the significance of delay in the diagnosis of meningitis cases. Id. at 38.

## Discussion

The purpose behind 28 U.S.C. § 2401(b)—the limitations provision of the FTCA—"is to require the reasonably diligent presentation of tort claims against the Government." United States v. Kubrick, 444 U.S. at 111, 123, 100 S.Ct. at 352, 360, 62 L.Ed.2d at 259 (1979). Section 2401(b), like statutes of limitations generally, represents a "legislative judgment that it is unjust to fail to put the adversary on notice to

defend within a specified period of time," *id.* at 117, 100 S.Ct. at 356, and that "the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Railway Telegraphers v. Railway Express Agency*, 321 U.S. at 342, 349, 64 S.Ct. at 582, 586, 88 L.Ed. at 788 (1944). Furthermore, because the statute waives the sovereign immunity of the United States, courts should be mindful to construe it in a manner which neither extends nor narrows the waiver Congress intended. *Kubrick, supra,* 444 U.S. at 117–118, 100 S.Ct. at 356–357, and cases cited therein.

■ Unfortunately, however, the legislative history to § 2401(b) is silent as to the meaning of "accrues." *See Kubrick, supra,* 444 U.S. at 119, 100 S.Ct. at 357. Consequently, the Court in *Kubrick* adopted the "general rule" prevailing among the circuits at the time that a cause of action accrues under the FTCA when "the plaintiff has discovered both his injury and its cause." *Id.* at 120, 100 S.Ct. at 358. Kubrick's cause of action was held to have accrued when he was informed by a civilian doctor that the neomycin treatment prescribed by a VA doctor for treatment of a femur infection following surgery had caused his hearing loss. Accrual, according to the Court, did not await Kubrick's awareness that prescription of neomycin for the infection was improper (a negligent act). Once Kubrick was aware of these "critical facts" underlying his injury and its cause, reasoned the Court, he could inquire in the medical and legal community as to whether his injury had been negligently inflicted. *Id.* at 123, 100 S.Ct. at 360.

■ Both the Government and the Arvayos rely on *Kubrick* for their respective positions. Although they agree as to the injury in this case—mental retardation—they disagree as to the "cause" of the injury. The Government argues that the cause of Jose's retardation was bacterial meningitis. Because the Arvayos were informed by doctors as early as January 31, 1979, that Jose was suffering from meningitis, and because those same doctors informed the Arvayos throughout Jose's treatment at St. Joseph's of the probability of brain damage as a result of the meningitis, the Government contends that the claim accrued no later than August, 1979, when the Arvayos were informed that Jose had in fact suffered brain damage. The Government asserts that such a result is dictated by this court's holding in *Gustavson v. United States,* 655 F.2d 1034 (10th Cir.1981).

The Arvayos, on the other hand, argue that the Government's chacterization of the cause of the injury is overly simplistic. They contend that the cause of Jose's retardation was not simply the meningitis; the cause of his injury was also Dr. DePoe's failure to diagnose his condition as meningitis and to treat it appropriately on January 30, 1979. The Arvayos assert that there is a basic theoretical distinction between malpractice cases involving a "commission"—an affirmative act which results in clearly identifiable injuries—and malpractice cases involving an "omission," i.e., a failure to diagnose, treat, or warn. *Kubrick,* the Arvayos assert, involved a situation in which the neomycin treatment—an affirmative act—administered by the VA doctors resulted in Kubrick's clearly identifiable hearing loss. Such is a case of "commission," argue the Arvayos, and should be distinguished from cases in which a plaintiff is aware of the bare medical cause of his or her injury, but is unaware of the omissions, or misdiagnoses, on the part of the treating physicians that exacerbated a previous condition. In fact, argue the Arvayos, the Supreme Court recognized such a distinction in *Kubrick:*

> That [a plaintiff] has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can

tell him if he has been wronged, and he need only ask.

444 U.S. at 122, 100 S.Ct. at 359.

We agree with the Arvayos insofar as they interpret *Kubrick's* use of the word "cause" to mean more than mere awareness of the medical cause in cases involving a failure to diagnose, treat, or warn. To a certain extent *Kubrick*, even though a case of commission, supports such a conclusion. There, the Court described the cause of Kubrick's hearing loss as "the neomycin treatment *administered* by the hospital." 444 U.S. at 114, 100 S.Ct. at 355. (Emphasis added.) Although Kubrick's hearing loss was caused directly by neomycin, both the drug itself and the hospital's affirmative action in administering that drug could be said to be "causes" of Kubrick's injury. In other words, more than one factor can be viewed as the "cause" of an injury.

Contrary to the Government's assertion, we believe that this court's opinion in *Gustavson, supra,* provides direct support for the proposition that the term "cause" in these cases includes more than just the medical cause of the plaintiff's injury. As a child, the plaintiff in *Gustavson* had seen several military doctors for what his parents believed to be unrelated ailments. He consulted some of these doctors for a severe bedwetting problem; others were consulted concerning a painful mass in his neck and a fever. All of these military doctors failed to diagnose these ailments as symptoms of vesico-ureteral reflux and the infection associated with it. In 1973 the plaintiff finally consulted with civilian doctors who correctly diagnosed and treated the condition by reimplanting his ureters. These civilian doctors also informed the plaintiff that the operation could have been done years before and that his kidneys had been damaged as a result of the long-continued reflux. *Gustavson, supra,* 655 F.2d at 1036. Four years later, in 1977, the plaintiff filed his administrative claim. Not long thereafter, following kidney failure and dialysis treatment, he died as a result of complications associated with his kidney failure.

*Gustavson* was thus a case involving multiple misdiagnoses—multiple omissions. For present purposes, however, *Gustavson* is important for the manner in which this court described the plaintiff's injury and its cause. There, applying the *Kubrick* definition of the word "accrues," we held that the plaintiff's cause of action accrued when he "knew of the injury (damage to his kidneys) and the cause (failure to correct his ureter disorder at an earlier stage)." 655 F.2d at 1036–1037. *Gustavson* thus recognized that the cause of the plaintiff's kidney damage was not simply vesico-ureteral reflux and its associated infection; the cause of his condition was also the military doctors' "failure to correct his ureter disorder at an earlier stage." *Accord Waits v. United States,* 611 F.2d 550, 552 (5th Cir. 1980) ("It is not enough to trigger the statute of limitations that the claimant is aware of his injury if he is unaware of the act or omission which caused the injury").

Applying *Gustavson* to the facts of the present case, we must reject the Government's contention that "bacterial meningitis" was the sole cause of Jose's injuries. The district court found that had Dr. DePoe properly diagnosed and treated Jose's condition on January 30, 1979, Jose would not suffer from the disabling injuries he now endures. There is thus a direct link between Dr. DePoe's misdiagnosis and Jose's injuries. This is not to say, however, that Dr. DePoe's omissions were the sole cause of Jose's injuries. Had Jose not been suffering from meningitis at the time Dr. DePoe examined him, there could be no "omission" on Dr. DePoe's part on which to premise liability. There were therefore two causes which combined together to produce a single injury.[2]

That we have concluded the district court correctly determined that Dr. DePoe's misdiagnosis was a cause of Jose's injuries

---

**2.** Such a conclusion may be analogized to the law of joint tortfeasors, which, it has been said, "rests very largely upon recognition of the fact that each of two or more causes may be charged with a single injury." Prosser & Keeton on Torts, at 268 (5th ed. 1984).

does not, however, end the inquiry. We must further determine whether, under the circumstances of this case, the Arvayos had a duty to inquire as to the cause of Jose's injuries earlier than the date they consulted their attorney upon another matter. Although the imposition of a duty to inquire as to causation may appear to be a departure from the Court's holding in *Kubrick* that once a plaintiff is aware of the existence of his or her injury and its cause, he or she is under a duty to make inquiries as to whether the injury was a result of *negligence*, in the context of failure to diagnose, treat, and warn cases such an extension of the duty seems unavoidable. The mere characterization of the "cause" of an injury in cases of this type as a "failure" or an "omission" implies in a very real sense that the doctor did not do something that he or she had a duty to do. Although, as a theoretical matter, a doctor's failure to detect an illness does not necessarily mean community standards of due care have been breached, we conclude that in the context of determining when a cause of action accrues any attempt to distinguish the two concepts would be largely futile. The existence of this dilemma was recognized by the dissenters in *Kubrick:* "In my judgment a fair application of [the "blameless ignorance"] rule[3] forecloses the Court's attempt to distinguish between a plaintiff's knowledge of the cause of his injury on the one hand and his knowledge of the doctor's failure to meet acceptable medical standards on the other," 444 U.S. at 127, 100 S.Ct. at 361 (Stevens, J. dissenting); arguably, this dilemma was also implicitly recognized by the majority:

As the dissent suggests ... we are thus in partial disagreement with the conclusion of the lower courts that Kubrick exercised all reasonable diligence. *Although he diligently ascertained the cause of his injury,* he sought no advice within two years thereafter as to whether he had been legally wronged. The dissent would excuse the omission. For statute of limitations purposes, we would not.

444 U.S. at 123, n. 10, 100 S.Ct. at 360, n. 10. (Emphasis added.)

Nevertheless, it is unnecessary for us to speculate on whether such an extension of the *Kubrick* duty to inquire is warranted, because such an extension has already occurred in this circuit. That is, the potential plaintiff already has the duty to inquire as to both "causation" and "negligence" in light of our holding in *Gustavson.* In *Gustavson,* the plaintiff's personal representative sought "to avoid application of the statute on the grounds that [the plaintiff] reasonably failed to draw a causal link between his injury and some of the negligent diagnoses by military doctors until within two years of the date of filing...." 655 F.2d at 1035. The causal connection that the plaintiff arguably reasonably failed to draw was between the misdiagnosis concerning a mass in his neck and his kidney problems. It was argued that the statute did not begin to run as to this misdiagnosis in 1973 because in 1973 the civilian doctors advised the plaintiff only of the probable connection between his bedwetting problems and his kidney damage; they did not advise him of the probable connection between the lump in his neck and his kidney problems. We held, however, that once the plaintiff was informed as to the probable connection between his bedwetting and his kidney damage, "the burden was upon him to ascertain in what

---

**3.** The "blameless ignorance" rule, announced by the Court in *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), provides that a cause of action does not accrue until the plaintiff's injury manifests itself. In that case, plaintiff Urie contracted silicosis while working as a fireman on a steam locomotive. Urie's condition was not diagnosed until after he became too ill to work. Reluctant to charge Urie with the "unknown and inherently unknowable," the Court held that because of his "blameless ignorance" of the fact of his injury, his cause of action did not accrue under the Federal Employers' Liability Act until the disease manifested itself. *Id.* at 169–170, 69 S.Ct. at 1024–1025. Although we conclude in this opinion that the Arvayos were not "blamelessly ignorant," we stress that under the appropriate circumstances the rule could excuse the failure to make any inquiries as to causation.

instances his condition should have been recognized." 655 F.2d at 1037. Inasmuch as the plaintiff in *Gustavson* was not explicitly informed as to a possible connection between the lump in his neck and his kidney problems in 1973, this court implicitly placed a burden upon him to discover not only whether these doctors breached a duty to him, but also to discover in the first instance whether there was a causal connection between their actions, or inactions, and his injury.

■ The question whether a plaintiff exercised reasonable diligence in inquiring as to the cause of his injury will of course vary with the facts of each particular case. In the present case, the plaintiff's parents never made any inquiries whatsoever. The district court found their failure to inquire reasonable, even though in a twenty-four hour time span they were told by one doctor that their son had a mere URI and to bring him back in a week if he did not improve, and the next day informed that their son was in critical condition, possibly suffering from meningitis, with the likelihood of brain damage. As we read the district court's opinion, it excused the Arvayos' failure to inquire for essentially two reasons: first, because they were a young couple, "wholly trusting of authority, particular medical persons"; second, because any inquiries the Arvayos' might have made would have been fruitless because none of the doctors at St. Joseph's were aware of Dr. DePoe and his diagnosis the day prior, and therefore were unaware of any delay in treatment. Memorandum Opinion at 35.

In our view, the district court's reasoning is flawed on both points. First, the quote describing the Arvayos, as well as a general reading of the district court's opinion, convinces us that the court applied a subjective standard rather than an objective standard to what the Arvayos' duty of inquiry was under the circumstances; the question whether the Arvayos were "reasonably diligent" is of course an objective one. Second, the court's reasoning fails because it would excuse the Arvayos' fail-

ure to inquire on the basis of its findings that doctors at St. Joseph's probably did not know of Dr. DePoe's diagnosis the previous day. In effect, what the district court would require is a duty of *disclosure* on the part of doctors, rather than a duty of *inquiry* on the part of plaintiffs. The question is not whether, in hindsight, the Arvayos' inquiries would have been fruitless because the St. Joseph's doctors did not know of Dr. DePoe's diagnosis and the subsequent delay in treatment. The question is simply whether a reasonable person in the Arvayos' position, with the knowledge of two drastically different diagnoses in a twenty-four hour period, with the concomitant likelihood of brain damage, would have made *some* type of inquiry. We must hold that under these circumstances it was unreasonable for the Arvayos to make no inquiries whatsoever.

We stress the fact that there is no issue of concealment on the part of any of the doctors or hospitals involved. *See, e.g., Waits, supra*, 611 F.2d at 553 (alternative holding). None of the critical facts in this case changed between January 31, 1979, and August, 1981, when Tina Arvayo fortuitously learned from her attorney that a delay in diagnosis of meningitis could lead to brain damage. The Arvayos' contention that a cause of action does not accrue under the FTCA in a failure to diagnose, treat, or warn case until they are aware—informed—of a possible connection between a misdiagnosis and an injury could possibly toll the statute indefinitely. We conclude that such a construction would be an unwarranted, unintended extension of the meaning of the word "accrues" as it is used in § 2401(b).

We do not intend to imply that in every failure to diagnose, treat, or warn case the plaintiff's cause of action accrues at the time the plaintiff receives a diagnosis different from a previous diagnosis and is aware that he or she has been injured. Nor do we decide the precise questions the Arvayos should have asked under these circumstances. We decide only that under these circumstances, a reasonable person in

the Arvayos' position would have made some type of inquiry as to whether Dr. DePoe's diagnosis had been correct, and if they had become suspicious that it had not been correct, whether the mistake may have contributed to Jose's brain damage. As even the dissenters recognized in *Kubrick:* "A plaintiff who remains ignorant through lack of diligence cannot be characterized as 'blameless.'" 444 U.S. at 128, 100 S.Ct. at 362.

It is with regret that our decision prevents any recovery by Jose and Tina Arvayo on behalf of their son, Jose, Jr. The damage to Jose, Jr. and the continuing pain and trauma for the entire family, is a tragedy, not to speak of the financial hardships they must surely endure unless private relief can be obtained, as we sincerely urge, through Congressional action.

REVERSED.

McKAY, Circuit Judge, dissenting:

The issue in this case is whether the district court's finding that plaintiff's medical malpractice claim was timely filed is clearly erroneous.

The relevant facts are uncontroverted. The mother of the infant plaintiff brought him to a military hospital on January 30, 1979, complaining of a nine-day fever and crankiness. After briefly examining the plaintiff, the family practitioner on duty, Dr. DePoe, diagnosed his condition as an upper respiratory infection, prescribed Triaminic Concentrate, and instructed plaintiff's mother to return with her child within a week if his condition did not improve.

Because plaintiff's condition had deteriorated significantly by the next day, his parents brought him to the emergency room of the military hospital. The emergency room physician, Dr. Pascua, preliminarily diagnosed plaintiff's condition as bacterial meningitis and transferred him to a civilian hospital for specialized care. There, the diagnosis of bacterial meningitis was confirmed and appropriate treatment was administered. Plaintiff was treated for meningitis through March of 1979, at which time he exhibited signs of brain damage.

On August 19, 1981, plaintiff's parents sought legal advice concerning the government's insurance coverage of their son's medical and therapy expenses. It happened that the attorney they consulted had had experience with medical malpractice cases involving the delayed diagnosis of meningitis. He informed plaintiff's parents that Dr. DePoe's failure to diagnose and treat bacterial meningitis was possibly the cause of plaintiff's brain damage. Plaintiff's parents proceeded to investigate the possibility of negligence and thereafter filed their FTCA claim on December 16, 1981.

At trial, plaintiff's attorney argued that plaintiff was suffering from the initial stages of bacterial meningitis when Dr. DePoe examined him on January 30, 1979, and that the doctor's failure to diagnose and treat the disease caused his injuries. The government lawyers argued that plaintiff was not suffering from meningitis at the time of Dr. DePoe's examination, and that the doctor's diagnosis and treatment of upper respiratory infection was appropriate. The government also contended that plaintiff's administrative claim was not timely filed under 28 U.S.C. § 2401(b) (1982), which provides that:

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim *accrues* or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

(emphasis added).

The trial court found that the claim was timely filed, that the government was negligent in failing to diagnose and treat the bacterial meningitis on January 30, 1979 and that, had the disease been properly diagnosed and treated on that date, plaintiff quite probably would not have suffered the brain damage and retardation that now afflict him. The court awarded damages in

the amount of $1,950,000, of which $1,000,000 was for pain and suffering.

On appeal, the government does not challenge the trial court's finding of negligence, but argues only that the administrative claim was not timely filed. The government does not contend, as part of its statute of limitations argument, that plaintiff's parents actually knew that the delayed diagnosis was a cause of plaintiff's injuries. Indeed, the government does not contest plaintiff's claim that no physician who treated plaintiff during his hospitalization informed his parents that Dr. DePoe's failure to diagnose the meningitis on January 30, 1979 and the resulting delay in treatment might have caused his brain damage. Nor does the government contest plaintiff's claim that Dr. Pascua, a colleague of Dr. DePoe who was retained by plaintiff's parents to treat plaintiff after his discharge from the hospital, did not inform them that Dr. DePoe's failure to diagnose and treat the meningitis might have caused plaintiff's brain damage. Rather, the government argues that the administrative claim was not timely filed because plaintiff's parents should have known of their cause of action more than two years prior to the date on which they filed this suit.

The definition of the word "accrues" in 28 U.S.C. 2401(b) has been the source of considerable judicial discussion. In *United States v. Kubrick*, 444 U.S. 111, 120, 100 S.Ct. 352, 358, 62 L.Ed.2d 259 (1979), the Supreme Court held that a cause of action accrues under the FTCA when "the plaintiff has discovered both his injury and its cause." I agree with the majority that under our holding in *Gustavson v. United States*, 655 F.2d 1034 (10th Cir.1981), the "cause" of plaintiff's injury for purposes of statute of limitations analysis was not merely the disease of bacterial meningitis, but also the delayed diagnosis of this disease. I do not, however, agree with the majority's decision to overturn the trial court's conclusion that plaintiff's parents were reasonably diligent in ascertaining the cause of plaintiff's injuries.

The majority finds that the district court incorrectly arrived at a finding of reasonableness because it applied "a subjective standard rather than an objective standard to what the Arvayos' duty of inquiry was under the circumstances," Maj.Op. at 1422, and because it excused "the Arvayos' failure to inquire on the basis of its findings that doctors at St. Joseph's probably did not know of Dr. DePoe's diagnosis the previous day." Maj.Op. at 1422. In my view this misconceives the district court's opinion. It is true, as the majority notes, that the district court refers to the plaintiff's parents as a young couple, "wholly trusting of authority, particularly medical persons." This does not necessarily mean, however, that the court was applying a subjective standard as to the diligence required of plaintiff's parents. The court's characterization of plaintiff's parents in this regard is certainly relevant to the first tier of statute of limitations analysis— whether they *actually* knew of the causal import of the delayed diagnosis. Moreover, the fact that the court uses the phrase "reasonably diligent claimant" in his opinion, 580 F.Supp. at 755, indicates that he was aware that the standard to be applied in the second tier of the analysis was an objective one. Further, I disagree with the majority's assessment of the trial court's finding that any inquiry would have been futile. Whether or not the likely futility of making inquiries of the doctors at the civilian hospital was relevant to the issue of plaintiff's parent's reasonableness, in my view the district court's finding that inquiry would have been futile was merely peripheral to its independent finding that plaintiff's failure to inquire was reasonable. Thus, the district court applied the correct standard in its statute of limitations analysis.

The question before the district court was whether it was reasonable for plaintiff's parents to believe that Dr. DePoe's diagnosis on January 30, 1979 was not a contributing cause to their son's brain damage and to fail to inquire into the accuracy of the belief. The question before us is not whether the plaintiff's parents were rea-

sonable in their conduct but, rather, whether the district court's finding that they were reasonable is so implausible as to merit reversal.

It is well-established that the question of when a claim accrues, for purposes of the FTCA limitation period, is a matter of federal law. *Exnicious v. United States*, 563 F.2d 418, 420 n. 6 (10th Cir.1977); *Stoleson v. United States*, 629 F.2d 1265, 1268 (7th Cir.1980); *Williams v. United States*, 405 F.2d 234, 235 n. 5 (5th Cir.1968). The issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question for the finder of fact. *See, e.g., Maughan v. SW Servicing, Inc.*, 758 F.2d 1381 (10th Cir.1985); *Lundy v. Union Carbide Corp.*, 695 F.2d 394 (9th Cir.1982); *Ballew v. A.H. Robins Co.*, 688 F.2d 1325 (11th Cir.1982); *Renfroe v. Eli Lilly & Co.*, 686 F.2d 642 (8th Cir. 1982).

The Supreme Court recently made clear the standard we are to apply in reviewing a trial court's factual findings in *Anderson v. City of Bessemmer City*, — U.S. —, —, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985):

> This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court. 'In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*.' ... If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous....
>
> This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.

(citations omitted).

In my view, the majority misconceives our role as a reviewing court. Not only is the district court better equipped to find facts, but fairness dictates that those findings be overturned only with great circumspection. As the Court noted in *Bessemer City:*

> the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much. As the Court has stated in a different context, the trial on the merits should be 'the main event' ... rather than a 'tryout on the road.'.... For these reasons, review of factual findings under the clearly erroneous standard—with its deference to the trier of fact—is the rule, not the exception.

*Id.* (citation omitted).[*]

I cannot conclude that the district court's findings as to plaintiff's parent's reasonableness were so implausible as to merit reversal. Certainly, the view that Dr. De-Poe's diagnosis was not a contributing cause because plaintiff was not suffering from bacterial meningitis at the time of Dr. DePoe's diagnosis was not so unreasonable as to prevent the government from arguing it at trial. Even had plaintiff's parents believed that their child was suffering from the disease at the time of the diagnosis, it is far from clear that it would have been

---

[*] In addition, we should not further burden our overburdened dockets by conducting exhaustive review of such fact-bound determinations. *Cf. California v. Carney*, — U.S. —, —, 105 S.Ct. 2066, 2071, 85 L.Ed.2d 406 (1985) (Stevens, J., dissenting) ("By promoting the Supreme Court as the High Magistrate for every warrantless search and seizure, this practice has burdened the argument docket with cases presenting fact bound errors of minimal significance.").

unreasonable for them to have believed that the injuries suffered by their son were the inevitable consequence of bacterial meningitis and that a mere day's delay in diagnosis had no affect on the extent of those injuries. Under these circumstances, a finding that a reasonable plaintiff would not have inquired further into the effect of the delayed diagnosis is not implausible.

I would affirm.