Susan **NICHOLS**, Plaintiff,

v.

**UNITED STATES of America,** Defendant.

No. 02–CV–4134–JAR.

United States District Court, D. Kansas.

March 11, 2004.

Jerry R. Palmer, Palmer, Leatherman & White, L.L.P., Topeka, KS, for Plaintiff.

David D. Plinsky, Office of United States Attorney, Topeka, KS, Charles G. Young, III, Arlington, VA, for Defendant.

## MEMORANDUM ORDER AND OPINION GRANTING JUDGMENT TO DEFENDANT

ROBINSON, District Judge.

This medical malpractice action brought under the Federal Tort Claims Act was tried to the Court on December 2–4, 2003. Plaintiff claims that Defendant United States of America acted negligently in failing to timely diagnose micronodular basal cell carcinoma. Plaintiff contends that Defendant should have diagnosed this skin cancer no later than February 1998; and that the delay until her diagnosis in July 1999 caused her to undergo a more invasive and disfiguring surgery affecting her nose and cheek area. Defendant denies that it negligently failed to diagnose in February 1998 or before. Defendant concedes it acted negligently in failing to diagnose this skin cancer in August 1998, but claims the surgical procedures Plaintiff underwent would have been no less severe or invasive had Defendant diagnosed the skin cancer in August 1998. Because Plaintiff has failed to establish that Defendant negligently failed to diagnose any earlier than August 1998 and because Plaintiff has not shown that this delay in diagnosis resulted in a more invasive, injurious or disfiguring surgery, the Court concludes Plaintiff has failed to prove causation and damages. Based on the testimony and exhibits, the Court makes the following findings of fact and conclusions of law and grants judgment to Defendant United States.

### FINDINGS OF FACT

On July 19, 1999, a doctor at the University of California Davis Medical Center (UC Davis) diagnosed micronodular basal cell carcinoma in Plaintiff Susan Nichols. On this date, Plaintiff presented with three lesions in the area of the right alar groove, which is the fold of skin between the cheek and right side of the nose. From August

1996 to February 1998, Plaintiff was treated by a board certified dermatologist, Dr. McGovern, in the dermatology clinic of Irwin Army Hospital.[1] At issue in this case are the facts and circumstances of Dr. McGovern's treatment of Plaintiff; specifically whether Plaintiff presented with complaints and/or clinically observable symptoms that Dr. McGovern failed to consider or respond to. What is not at issue in this case is that in August 1998 Plaintiff presented to the family practice clinic at Irwin Army Hospital complaining about oozing lesions near the alar groove area which were clinically observable; and that Plaintiff returned to the family practice clinic in October 1998 complaining that this same lesion(s) still had not healed, a condition that was clinically observable. It is undisputed that the nurse practitioner who examined Plaintiff on these two occasions was negligent; she failed to refer Plaintiff to a dermatologist, which is what the medical standard of care required.

At issue is whether Defendant was negligent before August 1998, and specifically whether Dr. McGovern was negligent in failing to diagnose Plaintiff's skin cancer during the time she was his patient. Plaintiff was seen in the Irwin dermatology clinic on four occasions: August 9, 1996; October 7, 1996; April 4, 1997; and February 3, 1998. Although Plaintiff contends that she was not seen by Dr. McGovern during the third visit, the Court finds that this is not credible; Plaintiff was seen by Dr. McGovern on each of these four occasions.

On each of these four visits, either a student Physician assistant (PA), or a dermatology technician first took history from Plaintiff. Then, Dr. McGovern examined Plaintiff and conversed with her in prescribing or recommending a treatment. There are two primary issues of fact: whether Plaintiff presented with complaints and/or clinically observable symptoms and whether Dr. McGovern failed to respond to the symptoms in accordance with the standard of care. Most of the complaints Plaintiff described in her testimony were not recorded in the medical record. Dr. McGovern and Marie Jordan, the dermatology technician who was present during three of the four visits, deny that Plaintiff presented with either the complaints or clinically observable symptoms Plaintiff now testifies about.

Thus, the Court must necessarily determine who is telling the truth about what Plaintiff said and what Dr. McGovern saw or should have seen during these visits. The Court decides these issues of fact and witness credibility based on the Court's careful attention to the witnesses' testimony, review of the medical records and other exhibits admitted in the evidence, and evaluation of the testimony of the expert witnesses. From this the Court makes inferences, deductions and conclusions, which reason and common sense lead the Court to draw from the facts established by the testimony and evidence in the case. Furthermore, in weighing the testimony of witnesses, the Court considers the witness's relationship to Plaintiff or to Defendant; any interest the witness may have in the outcome of the case; the witness's manner while testifying; the opportunity and ability to observe or acquire knowledge concerning the facts about which the witness testified; the witness's candor, fairness and intelligence; and the extent to which the witness has been supported or contradicted by other credible evidence. Because Plaintiff and Defendant dispute whether Plaintiff complained and/or presented with clinically observable lesion(s) warranting further examination and biop-

---

**1.** From 1996 to 1998, Plaintiff had been treated for a variety of ailments at Irwin Army Hospital, as a dependent of her husband, a soldier stationed at Fort Riley, Kansas.

sy, the Court makes the following findings about what occurred during each of the four visits.

Plaintiff had never been seen in the dermatology clinic at Irwin Army Hospital before her first appointment with Dr. McGovern on August 9, 1996. Plaintiff testified that she scheduled this appointment because she was concerned about a "hole" near the side of her nose. Plaintiff testified that this hole was the first of the three lesions she presented with in July 1999 at UC Davis. These three lesions were in or near the alar groove area between Plaintiff's cheek and the right side of her nose.

Melasma (redness), however, was the main complaint Plaintiff articulated when she made the appointment and when she came to the clinic on August 9, 1996. The medical records indicate that her primary complaint was melasma; and that she also complained about acne scarring. Dr. McGovern had no independent recollection of Plaintiff's complaints on August 9, 1996, but testified that the primary complaints are recorded: melasma and acne scarring. Marie Jordan, the dermatology technician, had an independent recollection of Plaintiff's complaints that day. Jordan recalled a conversation with Plaintiff in the reception area of the clinic, in which Plaintiff stated that she was concerned about the melasma on her face, that she was a model and that her face was more important to her than her own children.

The medical records indicate that acne scarring and Plaintiff's ten year history of acne were also discussed. Plaintiff had multiple ice pick scars on her forehead and nose, and wider, crater-like scarring on her cheeks. The notes of the PA student who took and recorded Plaintiff's history state that Plaintiff was concerned about a hole on the side of her nose. Dr. McGovern testified that he recalled the PA student bringing this hole to Dr. McGovern's attention. Dr. McGovern testi-

fied that this was a thin deep ice pick scar on the nare area of Plaintiff's nose, that is the fleshy side of the nostril. Dr. McGovern testified that Plaintiff had no "hole" or ice pick scar in or near the alar groove area. Marie Jordan's testimony was consistent, that the hole referred to was an ice pick scar on the fleshy side or nare of Plaintiff's nose. In contrast, Plaintiff testified that she and McGovern discussed the hole on the side of her nose. McGovern told her it was acne and perhaps due to sun exposure. Plaintiff testified that she advised McGovern that she had never had a pimple in that location and that she was adamant that she wanted it gone.

Of course, this is critically disputed testimony. If the Court believes Plaintiff, then this notation in the August 9, 1996 medical record is evidence of a clinically observable lesion in the same area as those seen in July 1999. If the Court believes the testimony of Dr. McGovern and Marie Jordan, then the note refers to an ice pick scar in a different area. Furthermore Plaintiff's expert did not dispute the testimony of Defendant's expert, as well as the testimony of Dr. McGovern that ice pick scars are not a clinical indication of basal cell carcinoma.

The Court need not decide this issue in a vacuum. The testimony of Dr. McGovern and Marie Jordan is corroborated by photographs taken in 1999, which show that Plaintiff had a number of ice pick scars on the nare of her nose, just as Dr. McGovern described. These photographs do not show any such scars in the alar groove area, however.

Plaintiff attempts to corroborate her testimony with photographs as well. Plaintiff presented two photographs purportedly taken in August 1996, the same month as her first visit to Dr. McGovern. These photographs, Plaintiff contends, depict the

hole that she complained about during her August 9, 1996 visit to Dr. McGovern. For several reasons, the Court finds that these photographs are not authentic depictions of Plaintiff's condition when she presented to Dr. McGovern on August 9, 1996. First, the only evidence of when these photographs were taken is the testimony of Plaintiff, that the two photographs were taken one day in August 1996 while she was on a train trip in California. Marie Jordan, who saw Plaintiff at least twenty-five times between August 1996 and February 1998, testified that Nichol's hair was always short, not long as depicted in the photographs. Plaintiff testified that her hair was always long during this period, producing a 1995 driver's license photo depicting her with long hair. But, the Court finds no reason to believe that Jordan was lying about the length of Nichols' hair in 1996.

From the Court's observation, as well as the observation of Defendant's expert, the so-called lesions depicted in these photographs may have been fabricated with an ink pen or other implement. Other evidence suggests that these photographs are suspect. First, the alleged lesion or hole depicted in the photographs does not appear consistent in the two photographs, despite the photographs having been taken the same day. In one photograph (Exhibit 26) the lesion appears to be a raised, round white lesion or mark, rimmed in red. It looks nothing like the dark, deep lesion depicted in the other photograph (Exhibit 25). Plaintiff testified that Exhibit 26 depicts the lesion without makeup; and Exhibit 25 depicts the lesion packed with makeup in an attempt to cover it up. But these explanations do not make sense. For if the lesion is a deep, large hole, as Plaintiff indicates, it surely does not appear that way in the photograph where it is uncovered by makeup.

Furthermore, the lesion in one photograph does not appear to be in the precise location as the lesion in the other photograph. The lesion in Exhibit 26 is closer to the alar groove; the lesion in Exhibit 25 appears to be more on the cheek area. In other words, the photographs are suspect because the lesions do not appear to be one and the same. Moreover, the lesions depicted in the photographs are quite large, as much as 6 mm to 1 centimeter or 1/4 to 1/2 inch in diameter. Even in these photographs, one taken from as much as fifteen feet distance, the lesion is quite noticeable. If that was the size of the lesion Plaintiff had on August 9, 1996, the Court doubts that she would have complained about melasma; she would have focused on this very large, unsightly lesion. Moreover, such a large lesion would have grown larger, and repeatedly bled, and scabbed over as long as it was unhealed. Not only is there no mention of a large lesion, there is no mention of an unhealed, bleeding, oozing lesion, until the summer of 1998. Even Plaintiff did not testify that this lesion was bleeding, oozing or scabbing during the time she was seen by Dr. McGovern.

If that was the size of the lesion Plaintiff presented with on August 9, 1996, there is no way Dr. McGovern, Marie Jordan, or anyone could not have noticed it. The Court has no doubt that had Plaintiff presented with a lesion like those depicted in the two photographs, Dr. McGovern would have done further examination or biopsy. Although Plaintiff suggested through cross examination of Dr. McGovern that he was an inexperienced dermatologist, in just his second week of clinical practice, the Court finds that Dr. McGovern was quite competent. Dr. McGovern testified that had he seen any indication of lesions, holes or suspicious growths, particularly in the alar groove, which is an area with a higher incidence of micronodular basal cell, he

would have done a biopsy during the visit. Biopsies were routinely done, when indicated, and the dermatology technicians had been trained by Dr. McGovern to do them as well.

In fact, the evidence, from those who worked with him, was that Dr. McGovern was an earnest and intense young doctor, with a particular interest in diagnosing and treating skin cancers. While at Ft. Riley, Dr. McGovern established a monthly walk-in clinic to screen for skin cancer. And, even Plaintiff's expert agrees that Defendant's records show Dr. McGovern took a "significant number" of biopsies and was "attentive to performing biopsy technique" even in his first few months at Irwin Army Hospital. In short, the Court finds that the photographs were either fabricated or were taken at some time other than August 1996.

The Court simply finds the testimony of Dr. McGovern and Marie Jordan more credible and more consistent with the medical records and other evidence in this case. Plaintiff's testimony is not credible. Plaintiff suggests that Jordan is not credible because she disliked Plaintiff and considered her vain. Plaintiff suggests that McGovern is not credible because he considered Plaintiff a malingerer. Even if Marie Jordan and Dr. McGovern perceived Plaintiff as vain and obsessed with her appearance, there is no evidence that this perception affected their care of Plaintiff. In addition to Plaintiff's four visits with Dr. McGovern, she stopped in the dermatology clinic more than twenty-five times from 1996 to 1998, engaging in pleasant conversation with Marie Jordan, and reporting to Jordan her progress with the regimen prescribed by Dr. McGovern to clear up her acne and melasma. Dr. McGovern saw Plaintiff once when she had no scheduled appointment, accommodated her cancelled appointments and rescheduled appointments on other occasions, and examined a prolapsed scar from a mole removed by another doctor. Dr. McGovern consulted with Plaintiff by phone three or four times. The only reason Dr. McGovern did not see Plaintiff more than four times was that Plaintiff failed to make follow-up appointments with the frequency he advised.

In short, the Court finds the testimony of Dr. McGovern and Marie Jordan credible and the testimony of Plaintiff not credible concerning her complaints on August 9, 1996. Similarly, the Court discounts Plaintiff's testimony that Dr. McGovern did not examine or palpate her skin, nor examine her skin cleansed of makeup. The Court finds credible the testimony of Dr. McGovern, which was corroborated by the testimony of those who worked with him, as well as the medical records, that he examined Plaintiff's skin on that first visit and on all four visits. On this first visit, he palpated her skin and examined her skin using the bright overhead clinic lights. He also examined her skin under a Wood's lamp, which illumines the skin in a manner that discriminates superficial from deep melasma. Consistent with the complaints and clinical observations of melasma and active acne, Dr. McGovern prescribed tetracycline and benzoil peroxide, explaining that he could not address the acne scarring until the active acne was resolved. Even Plaintiff's expert acknowledges, that if Plaintiff did not present with the complaints and lesions she claims, McGovern's treatment of Plaintiff at that first visit did not deviate from the standard of care.

Apparently in a phone consultation in September 1996, McGovern prescribed Retin A, which Plaintiff picked up along with a brochure on a chemical peel procedure he recommended once the active acne had cleared. Although Plaintiff told Dr. McGovern that she had problems tolerating Retin A in the past, he advised her to try

it, as it best resolved two of her skin problems. Plaintiff tried it and it caused inflammation. Plaintiff called the clinic on October 7, 1996, complaining about multiple "holes" in her face, in a manner Dr. McGovern testified was quite dramatic. Dr. McGovern saw Plaintiff that same day. Plaintiff presented with eight dime sized erosions on her forehead and cheeks, but not in the alar groove or nose area. Plaintiff testified that by this second visit, there were two lesions in the alar groove area, the second just below the first lesion present in August 1996. The medical records do not reflect any complaint or observation of a lesion or lesions on the side of Plaintiff's nose; and Dr. McGovern and Marie Jordan testified that Plaintiff raised no such complaint. The Court finds that Plaintiff's testimony is not credible on this issue.

In this second visit on October 7, 1997, Dr. McGovern neither touched nor examined Plaintiff's skin under the Woods lamp, for her skin was very inflamed. Instead, he addressed the immediate problem by stopping her use of Retin A and prescribing two other medications, as an alternative. Plaintiff later stopped by the clinic to report to Jordan her satisfaction with this new regimen, and that she planned to recommend it to a friend.

Despite Dr. McGovern telling Plaintiff that he wanted to see her a month after October 7, 1996, she did not schedule another appointment with him until April of 1997, some five months later. During this five month interim, she stopped by the clinic numerous times, repeatedly asking Marie Jordan what Dr. McGovern could do about her melasma and acne scars. Plaintiff did not complain about lesions in the alar groove of her nose. Also during this five months, another doctor biopsied a mole on her back; Plaintiff did not mention the alleged legions to that doctor either. Nor did she mention the lesion or lesions to Dr. McGovern in phone consultations with him on November 4 and November 12, 1996.

After cancelling an appointment scheduled for March 27, 1997 and failing to show up for an appointment on April 3, 1997, Plaintiff was seen by Dr. McGovern and Marie Jordan on April 4, 1997. The Court does not believe Plaintiff's testimony that she did not see Dr. McGovern but only saw a PA during this visit, as the medical record indicates otherwise. Nor does the Court believe Plaintiff's testimony that she complained about the second lesion during this visit.[2] The medical records indicate that this appointment was a followup for acne scarring. Dr. McGovern noted that the active acne was clearing up although there was some residue of active acne lesions. Dr. McGovern discussed with Plaintiff options for treatment of the acne scarring, and advised Plaintiff that he needed to see her in three months.

Nichols did not return for a followup appointment in three months as Dr. McGovern directed. She waited ten months. During those ten months, she continued to stop by the clinic and visit with Marie Jordan when she was at the hospital for other purposes; the records show she was at the hospital six out of those ten months. She also had phone consultations with Dr. McGovern on June 24, 1997 and September 15, 1997.

Nichols' last visit with Dr. McGovern was on February 3, 1998. Marie Jordan was not present for this appointment. The medical record includes a long note written by Dr. McGovern on this date, describing his examination of her, and his findings that the inflammatory acne was well con-

---

**2.** Notably Plaintiff did not testify that she continued to complain about the first "hole." It is unclear whether she claims that it had healed or not.

trolled and that no new lesions were seen. Plaintiff did not complain nor present with a lesion or lesions in the alar groove. Dr. McGovern noted that her acne scars were too numerous to count. He discussed with Plaintiff her option for dermabrasion by a civilian doctor. Dr. McGovern also refilled Plaintiff's prescriptions, told her he was leaving, and that she needed to schedule a followup visit in six months, because acne has to be controlled for a certain period of time before anyone will do laser abrasion.

In short, Plaintiff's actions between August 1996 and February 1998 belie her claim that she repeatedly presented complaining of a clinically observable lesion or lesions. Surely if she had a large lesion that was not only this unsightly in appearance but was bleeding or oozing, she would have kept follow up appointments, and would not have raved to Marie Jordan about the positive effects of the prescribed regimen.

Plaintiff never saw the dermatologist who replaced Dr. McGovern. Plaintiff testified that her attempts to schedule an appointment were rebuffed; that she was told she needed to be referred for a "consult." Because she was an established patient in the dermatology clinic, this was misinformation, if someone told her that. In any event, Plaintiff was seen by a nurse practitioner in August 1998 and again in October 1998. It is undisputed that Plaintiff complained about a lesion, and that the lesion was clinically observable. Plaintiff testified that she complained about lesions, but the August 20, 1998 medical record indicates that she complained about one lesion. The note indicates that this lesion was bleeding, oozing and crusting, yet the nurse dismissed it as a bug bite and refused Plaintiff's requested referral to a dermatologist. The October 30, 1998 medical record states that there is a recurring sore on Plaintiff's nose, referring to the same lesion seen in August. Again the nurse practitioner refused to refer Plaintiff to a dermatologist.

From October 30, 1998 to July 19, 1999, Plaintiff did not seek any medical attention for this lesion or lesions. The fact that she failed to seek treatment during those nine months suggests that the lesion did not appear until the summer of 1998, and when it did, it was in the alar groove and not as noticeable as a lesion on the cheek would have been. Perhaps this is why Plaintiff accepted the nurse practitioner's dismissive explanation, and did not seek further treatment until she and her husband moved to California in July 1999. Of course, sometime during that interim, three lesions were clinically observable in the alar groove as well. By the time Plaintiff presented to UC Davis in July 1999, there were three lesions in the alar groove area on the right side of her nose. The dermatologist noticed the lesions from several feet away and immediately suspected micronodular basal cell carcinoma. A biopsy confirmed his suspicions. The tumor, excised by Dr. Rosio, was rather large, 3 cm by 2.6 cm.

Dr. McGovern, Defendant's expert, Dr. Belcido, and Plaintiff's expert Dr. Rosio agree that micronodular basal cell carcinomas grow geometrically, but quite slowly. Dr. Belcido testified that some literature suggests that these tumors may grow more rapidly in persons under the age of 35, as Plaintiff was. Although the doctors agree that this tumor would have grown in size over time, they disagree about the ability to estimate the origin and rate of growth of such a tumor from its size at the time excised.

Dr. Rosio testified that it is probable that this tumor increased forty percent in size between February 3, 1998 when Plaintiff was last seen by Dr. McGovern and July 1999 when he discovered the tumor. Dr. Rosio did not discuss or explain any-

thing about the typical rate of growth of such tumors. But, Dr. Rosio opined that based on the large size of the tumor, 3 cm by 2.6 cm, and the slow growing nature of these tumors, there is a "high degree of medical certainty" that the tumor was present one to three years before July 1999; and that it was probable that the tumor was present " I would guess three to five years" before July 1999; and was "probably" clinically observable four years before July 1999.

Drs. McGovern and Belcido testified that it is impossible to estimate with any degree of medical certainty when Plaintiff's tumor originated and how fast it grew, and impossible to extrapolate this information from the size of the tumor excised by Dr. Rosio. Interestingly, Dr. Rosio testified that he could not say what percentage of growth took place between 1996 and 1998 versus 1998 and 1999, and he could not say with reasonable medical certainty the percentage of growth from October 30, 1998 to July 1999.[3] But if these tumors grow progressively, through cellular division, the Court does not understand how Dr. Rosio can estimate the growth for one period but not another. The Court is thus persuaded that although these tumors grow progressively, the rate of their growth, is as Drs. Belcido and McGovern testified, unpredictable.

There are other problems with Dr. Rosio's opinion. First, his opinion is based on an assumption that the tumor was present in August 1996, and that the two photographs are accurate depictions of lesions that were clinical indications of the tumor in 1996. But the Court has already discounted the testimony and photographs underlying Dr. Rosio's assumption. And Dr. Rosio acknowledges that it is possible

that there was no clinical manifestation until August 20, 1998. Secondly, Dr. Rosio did not explain how he derived this estimation that the tumor grew forty percent between February 1998 and July 1999.

The Court adopts the expert opinion of Dr. Belcido, and the consistent testimony of Dr. McGovern, that micronodular basal cell carcinoma originates deep, in between the first and second layers of the epidermis, and may not impact the surface of the skin for quite some time. When it becomes clinically observable, it typically presents as a flat, or slightly raised lesion that is red or flesh colored. The difficulty of observing and thus diagnosing this type of basal cell carcinoma is demonstrated by one study referred to by Dr. Belcido. This study demonstrates that in a population of patients who had basal cell carcinomas excised, despite close medical monitoring, recurring tumors were not discovered for as long as eleven years, with the average time of discovery thirty-six months. Thus, the Court finds that the age and rate of growth of this tumor is unknown, but that there are clinically observable indications that it existed in the summer of 1998, and that it would have grown to some undeterminable extent between the summer of 1998 and July 1999.

The parties also presented expert testimony about the injury attributable to the delayed diagnosis. Dr. Rosio testified that because of the delay, Plaintiff underwent Mohs surgery, which was more invasive, and involved more reconstruction and facial scarring than she would have otherwise had. Again, Dr. Rosio did not explain this opinion, but it was presumably based on his opinion that the tumor grew forty percent from February 1998 to July 1999.

---

**3.** Even Dr. Rosio acknowledges, on the other hand, that Plaintiff's delay of seventeen months (February 1998 to July 1999) in seeking treatment was a significant period of de-

lay, supporting Defendant's argument that to the extent there was damage flowing from the delay, Nichols failed to reasonably mitigate.

Because Dr. Rosio opined that Dr. Mc-Govern breached the duty of care no later than February 1998, Dr. Rosio did not consider nor render an opinion about the injury from a delay in diagnosis from August 1998 to July 1999. For this reason, his opinion is not persuasive or helpful.

Dr. Belcido, on the other hand, opined that Mohs surgery would have been performed whether the tumor was discovered in July 1999, August 1998 or earlier. In fact, Mohs surgery is the prescribed course for micronodular basal cell carcinoma. Micronodular basal cell tumors are not one large tumor, but are composed of small pieces that form in clusters much like grapes, with "skip areas" between pieces of the tumor. The Mohs procedure involves cutting layers from the excision area, sending each layer to pathology for a determination of whether there are cancerous cells in the layer. Once all cancerous cells have been excised in this manner, the surgeon cuts a "margin" of healthy skin from the site, to ensure that any scattered cells have been excised. This is accomplished in the first stage of the Mohs procedure. In the second stage of the Mohs procedure, the surgeon reconstructs the excised area. This Dr. Rosio did by cutting a flap in Plaintiff's cheek, and closing the large incision by moving the cheek, as well as by grafting skin. He also had to use cartilage from Plaintiff's ear to reconstruct cartilage in her nose that had been affected by the tumor.

Plaintiff's Mohs surgery was done in two stages, the minimum number of stages, according to Dr. Belcido. Some tumors' size and location require even more stages of Mohs. But, according to Dr. Belcido, even if the tumor had been discovered earlier, two stage Mohs surgery would have been done. And, given the location of the tumor, it is likely that the tumor would have affected the cartilage in the nose, even had it been detected earlier.

Because the size of the excision affected various planes of skin on Plaintiff's face, the surgeon also used laser abrasion to smooth the surfaces of her nose and cheek area. Dr. Belcido testified that although Dr. Rosio did laser abrasion on Plaintiff's entire face, with the exception of the affected cheek area, the laser abrasion was done for contouring and cosmetic purposes, improving acne scarring as well.

## DISCUSSION

### Statute of Limitations

Before trial, the Court denied Defendant's motion to dismiss, which was based on Defendant's argument that Plaintiff's claim was barred by the statute of limitations. Because the Court concluded that issues of fact precluded this determination, the Court denied the motion, but necessarily addresses the issue now. Under the Federal Tort Claims Act ("FTCA"), a tort claim against the United States is forever barred "unless it is presented to the appropriate Federal agency within two years after such claim accrues." [4] Timely compliance with § 2401(b) is a jurisdictional prerequisite to maintenance of a FTCA suit.

The point at which a cause of action accrues under the FTCA is governed by federal law. [5] Under § 2401(b), a claim accrues when the plaintiff has (1) knowledge of the injury, and (2) knowledge of its cause. [6] "[A] legally cognizable injury or damage begins the running of [the FTCA's statute of limitations] even though the ulti-

---

**4.** 28 U.S.C. § 2401(b).

**5.** *See Newcomb v. Ingle,* 827 F.2d 675, 678 (10th Cir.1987).

**6.** *Arvayo v. United States,* 766 F.2d 1416, 1419 (10th Cir.1985).

mate damage is unknown or unpredictable."[7]  "Lack of knowledge of the injury's permanence, extent, and ramifications does not toll the statute."[8]

In cases involving alleged failures to diagnose or treat, the Tenth Circuit has held that knowledge of "cause" means more than mere awareness of the medical cause of injury.[9]  There must also be knowledge of the causal connection between the injury and the misdiagnosis, or knowledge sufficient to cause a reasonably diligent person to inquire into causation.[10]  However, knowledge of *negligence* is not necessary. Both the Supreme Court and the Tenth Circuit have made it clear that knowledge of negligence is irrelevant to accrual under § 2401(b).[11]  Accrual only requires knowledge that the failure, whether or not negligent, was a cause of the injury, or knowledge of information sufficient to cause a reasonably diligent person to inquire into causation.

■ Plaintiff argues that her claim accrued on or about July 20, 1999, the date of Dr. Rosio's diagnosis.  Defendant claims the cause of action accrued on August 9, 1996.  Despite Plaintiff's testimony about the clinically observable lesions in 1996 and later, the Court finds this testimony not credible.  The Court finds that until Plaintiff presented with a bleeding, oozing lesion in August 1998 that remained unhealed in October 1998, there was no clinically observable lesion or symptom that required further investigation or biopsy.

Because the Court does not believe that there was any clinical indication nor that Plaintiff was aware or even complained of such, her cause of action could not have accrued on August 9, 1996.  In fact, her cause of action could not have accrued until the summer of 1998, when she presented with a bleeding, unhealed lesion, which she knew was not a bug bite, and received a dismissive explanation coupled with a refusal to refer her to a doctor.  At this point she knew she had an injury and although she did not know its cause, she knew it was not the cause given to her by the health care provider.  In this case, the Court has resolved the merits, and has determined that until the summer of 1998 and specifically on August 20, 1998 at the earliest or in October 1998 when she was again seen by the nurse practitioner, Plaintiff was not on notice of sufficient facts to cause a reasonable person to inquire further.  Because she filed this tort claim on July 20, 2000, she timely filed within the two year statute of limitations.

**Negligence**

Under the FTCA, the United States is liable "for injury . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[12]  Therefore, Kansas law applies.  In *Kernke v. Menninger Clinic, Inc.,*[13] the court held

---

7.  *Robbins v. United States,* 624 F.2d 971, 973 (10th Cir.1980).

8.  *Gustavson v. United States,* 655 F.2d 1034, 1036 (10th Cir.1981).

9.  *Arvayo,* 766 F.2d at 1420.

10.  *Id.* at 1421–22.

11.  *See United States v. Kubrick,* 444 U.S. 111, 123, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) ("We thus cannot hold that Congress intended that 'accrual' of a claim must await awareness by the plaintiff that his injury was negli-

gently inflicted"); *Gustavson v. United States,* 655 F.2d 1034, 1037 (10th Cir.1981) ("Whether doctors who treated him had been negligent in not discovering his condition and recommending surgery relates to the question of knowledge of malpractice, a matter irrelevant to the running of the statute of limitations.")

12.  28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

13.  172 F.Supp.2d 1347, 1352–53 (D.Kan.2001)(citing *Sharples v. Roberts,* 249 Kan. 286, 816 P.2d 390, 397 (1991) (quoting *Durflinger v. Artiles,* 234 Kan. 484, 673 P.2d

that to establish a claim for medical malpractice in Kansas, a plaintiff must demonstrate that the defendant owed him a duty, the defendant breached the duty and a causal nexus exists between the duty breached and the plaintiff's injury. "Except where the lack of reasonable care or the existence of proximate cause is apparent to the average layman from common knowledge or experience, expert testimony is required in medical malpractice cases to establish the accepted standard of care and to prove causation."[14] A plaintiff's failure to establish these elements against a particular defendant will entitle that defendant to judgment as a matter of law.[15]

### Breach of Duty of Care

■ In this case, Plaintiff has failed to establish these elements by a preponderance of evidence. First, Plaintiff has failed to establish that Defendant breached the duty of care in the course of Dr. McGovern's treatment of Plaintiff, for Dr. McGovern used ordinary care and diligence, along with the degree of learning and skill ordinarily possessed and used by dermatologists in the community.[16] Dr. Rosio's opinion that Dr. McGovern breached the duty of care is dependent on the veracity of Plaintiff's testimony and the authenticity of the photographs allegedly

showing her condition in August 1996. The Court, for many reasons, has found that Plaintiff's testimony concerning her complaints and appearance in August 1996 is not credible and that the photographs are not credible either.

### Causation

■ Plaintiff has established that Defendant breached the duty of care beginning in August of 1998 when Plaintiff presented with complaints and a clinically observable lesion that warranted her referral to a dermatologist. But Plaintiff has failed to establish causation; she has not shown a causal nexus between the delay of diagnosis between August 1998 and July 1999, and the injury she suffered. Although Plaintiff underwent Mohs surgery, requiring reconstruction of her cheek area, grafting of skin and cartilage and laser ablation to the affected areas, there is no evidence that Plaintiff would not have had to undergo these same procedures had she been diagnosed in August 1998, or even before. Mohs surgery is the indicated procedure for this type of carcinoma, no matter when discovered; and there is no evidence that the size or situs of the tumor in August

---

86, 91 (1983))); *see also Rios v. Bigler,* 847 F.Supp. 1538, 1542 (D.Kan.1994) (citing *Durflinger,* 673 P.2d at 92) ("Under Kansas law, a physician has a duty to use reasonable and ordinary care and diligence in the diagnosis and treatment of his or her patients, to use his or her best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other physicians in the same or similar locations under like circumstances.")

**14.** *Bacon v. Mercy Hosp. of Ft. Scott,* 243 Kan. 303, 756 P.2d 416, 420 (1988) (citations omitted).

**15.** *Rios,* 847 F.Supp. at 1542 (citing *Mellies v. Nat'l Heritage, Inc.,* 6 Kan.App.2d 910, 636 P.2d 215, 218 (1981)).

**16.** PIK 3d 123.01 is the Kansas pattern instruction for medical malpractice (failure to diagnose/treat) claims, and states:

> In performing professional services for a patient, a Dermatologist has a duty to use that degree of learning and skill ordinarily possessed and used by members of that profession and of that school of medicine in the community in which the Dermatologist practices, or in similar communities, and under like circumstances. In the application of this skill and learning the Dermatologist should also use ordinary care and diligence. A violation of this duty is negligence.

1998 called for a less invasive or injurious procedure.

Nor is there convincing evidence that the delay in diagnosis caused injury in the form of a higher risk of recurrence. Dr. Rosio testified, without explanation, that Plaintiff has a five percent risk of recurrence because of the size of the tumor and delay in diagnosis. Dr. Belcido quoted literature that the only relevant factor in the risk of recurrence is the tumor's location; and a tumor that surfaces in the alar groove does present a heightened risk, that is a one percent risk of recurrence. All doctors agreed that the first five years is critical; the median and average recurrence times occur between two and three years. In July 2004, Plaintiff will have lived five years without any recurrence, and as Dr. Rosio testified, will be at that point, outside of the danger zone.

**Damages**

■ Even if Plaintiff had shown causation, she has failed to show damages attributable to any such injury. Plaintiff seeks damages for medications and medical examinations that she would have borne even if she had been diagnosed in August 1998. Plaintiff also seeks non-economic damages based on injury to her self image from others looking at her facial scars, and her feelings that she is not beautiful and is the object of other's curiosity. But, there is no evidence that an earlier surgery would have been less invasive, would not have resulted in facial scarring and would not have resulted in these same economic damages. Finally, Plaintiff seeks to recover the cost of custom made makeup products to cover the facial scarring. The Court notes that at trial Plaintiff appeared in makeup and the Court observed that her facial scarring is barely noticeable. The Court could not ascertain the extent of her scarring without makeup, because Plaintiff did not appear at trial without makeup. If Plaintiff had proved

causation, her damages would be minimal if any.

**IT IS THEREFORE ORDERED BY THE COURT** that Judgment is Granted to Defendant.

**IT IS FURTHER ORDERED** that this case is **DISMISSED.**